**In re WAYPORT, INC. LITIGATION.**

**Consol. C.A. No. 4167–VCL.**

Court of Chancery of Delaware.

Submitted: Jan. 31, 2013.
Decided: May 1, 2013.

See also 2009 WL 2246793.

Bruce E. Jameson, Marcus E. Montejo, Prickett, Jones & Elliott, P.A., Wilmington, Delaware; Attorneys for Plaintiffs.

Gregory V. Varallo, John D. Hendershot, Rudolf Koch, Scott W. Perkins, Richards, Layton & Finger, P.A.; Attorneys for Defendants Wayport, Inc. and Gordon P. Williams, Jr.

M. Duncan Grant, James H.S. Levine, Pepper Hamilton LLP, Wilmington, Delaware; Roger A. Lane, Courtney Worcester, Foley & Lardner LLP, Boston, Massachusetts; Attorneys for Defendants New Enterprise Associates VIII L.P. and New Enterprise Associates 8A L.P.

Michael F. Bonkowski, Cole, Schotz, Meisel, Forman & Leonard, P.A., Wilmington, Delaware; John J. McKetta III, Graves Dougherty Hearon & Moody, P.C., Austin, Texas; Attorneys for Defendant Trellis Partners Opportunity Fund, L.P.

## OPINION

LASTER, Vice Chancellor.

The plaintiffs sued for damages arising out of their sales of stock in Wayport, Inc. ("Wayport" or the "Company"). Vice Chancellor Lamb granted the defendants' motion to dismiss in part, and his rulings represent law of the case. *See Latesco, L.P. v. Wayport, Inc.,* 2009 WL 2246793 (Del.Ch. July 24, 2009) (the "Dismissal Opinion"). The litigation proceeded to trial against the remaining defendants on claims for breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, common law fraud, and equitable fraud. Judgment is entered in favor of plaintiff Brett Stewart and against defendant Trellis Partners Opportunity Fund, L.P. ("Trellis Opportunity Fund") in the amount of $470,000, subject to an adjustment to be calculated by the parties in accordance with this opinion, plus pre- and post-judgment interest at the legal rate, compounded quarterly. Judgment otherwise is entered against the plaintiffs and in favor of the defendants.

## I. FACTUAL BACKGROUND

The case was tried on September 17–20, 2012. The parties introduced over 400 exhibits, submitted deposition testimony from nineteen witnesses, and adduced live testimony from ten fact witnesses and one expert witness. The burden of proof rested on the plaintiffs. Having evaluated live witness testimony, weighed credibility, and considered the evidence as a whole, I make the following factual findings.

### A. Wayport's Early Days

Wayport was a privately held Delaware corporation with its principal place of business in Austin, Texas. Founded in 1996, the Company was a pioneer in designing, developing, and enabling Wi–Fi hotspots, which use a wireless router to offer internet access within the immediate vicinity. Stewart was Wayport's original CEO, a member of its board of directors (the "Board"), and a named inventor on most of its patents. Plaintiffs Dirk Heinen and Brad Gray were the Company's vice president of operations and vice president of sales, respectively.

Early on, Heinen introduced Stewart to John Long, who was a partner in a venture capital firm known as Trellis Partners.[1] In 1998, Trellis purchased Series A Preferred Stock in Wayport and obtained (i)

---

1. Trellis Opportunity Fund is the only Trellis-affiliated defendant in the case. Non-party Trellis Partners Opportunity Management, LLC ("Trellis GP") is the general partner of Trellis Opportunity Fund, and non-party Alex Broeker is the managing member of Trellis GP. Non-parties Trellis Partners, L.P. and Trellis Partners II, L.P. were Trellis-affiliated funds also managed by Broeker through Trellis GP. Trellis Partners, L.P. acquired the Series A Preferred Stock. Trellis Partners II, L.P. and Trellis Opportunity Fund held later series of preferred stock. For simplicity, I refer only to "Trellis."

the right to designate a director, (ii) the right to receive financial information, and (iii) a right of first refusal ("ROFR") on plaintiffs' shares. Long joined the Board as the Trellis designee. He had primary responsibility for Trellis's investment in Wayport, but often discussed the Company's progress with Broeker, one of his partners at Trellis.

In 1999, Wayport sought additional funding. Trellis introduced Wayport to Richard Kramlich, a partner in the venture capital firm New Enterprise Associates ("NEA").[2] NEA purchased Series B Preferred Stock in Wayport and obtained (i) the right to designate a Board observer, (ii) the right to receive financial information, and (iii) a ROFR on plaintiffs' shares. Kramlich became NEA's Board observer and had primary responsibility for NEA's investment.

### B. The Bursting Of The Technology Bubble

In 2000, the technology bubble burst, and Wayport's business prospects soured. Wayport's struggles led the Board to consider a management transition. According to the defendants, Stewart was forced to step aside. Stewart testified that he did not oppose the change. He considered himself a "technology and analysis" buff, and once fundraising and cash flow issues became all-consuming, Stewart felt he was out of his "comfort zone." Tr. 90.

In fall 2000, Dave Vucina took over as CEO, and Stewart received the title of President. Stewart soon became disenchanted with his new role, which he felt was "ambiguous," "uncomfortable," and "poorly defined." Tr. 91. In late 2001,

Stewart resigned from all positions with the Company. He nominated Heinen to serve as a director in his stead, and Heinen continued as a director until May 2005.

### C. Wayport's Prospects Revive.

Under Vucina's leadership, Wayport reduced its cash burn and began to turn around its business. Over four years, thanks in part to a rebounding economy and the advent of smart phones, the Company went from operating at a loss on little revenue to generating $90–100 million in sales with positive cash flow and a healthy balance sheet.

In 2005, Wayport began exploring an initial public offering. In preparation, Vucina hired defendant Gordon P. Williams, Jr. as Wayport's new general counsel. In the trial record, Gordon Williams is referred to frequently as Chuck Williams. Another Wayport employee, Greg Williams, plays a smaller part in the case. To distinguish between the two, and because Gordon Williams has the more prominent role, I refer to him as "Williams." When his colleague enters the frame, I refer to him as "Greg Williams."

Williams took steps to "prepare [Wayport] for an IPO" by implementing what he believed were "best practices" with respect to sharing financial and other information about the Company. Tr. 874–75. Wayport previously shared information freely with directors and stockholders alike. Williams worried that sharing unaudited financial information posed a risk of misleading investors and could lead to violations of securities laws. He therefore instituted a policy that required any common stockholder who wanted informa-

---

**2.** New Enterprise Associates VIII L.P. and New Enterprise Associates 8A L.P. (jointly, the "NEA Funds") are the only NEA-affiliated defendants in the case. Non-parties NEA Partners VIII, L.P. and NEA Partners 10, L.P. were the general partners, respectively, of the two NEA Funds. Non-party Charles W. Newhall, III was the general partner of the two NEA Funds' general partners. For simplicity, I refer only to "NEA."

tion to make a formal books and records demand pursuant to Section 220 of the Delaware General Corporation Law (the "DGCL"), 8 *Del. C.* § 220, and sign a nondisclosure agreement (collectively, the "Section 220 Policy"). The Section 220 Policy did not affect Trellis or NEA, because they had contractual information rights and representatives in the boardroom.

Also in 2005, Wayport management began to explore whether the Company could better utilize its intellectual property. As an initial step, Wayport hired Craig Yudell, a patent attorney with the firm Dillon & Yudell, to clean up the portfolio. Yudell's firm also served as a patent broker, and Wayport anticipated that Yudell might serve in that role. Over the next twelve to eighteen months, Yudell organized a patent inventory, assessed the portfolio's potential value, and determined which patents required the filing of amendments with the U.S. Patent and Trademark Office ("USPTO").

### D. Stewart Offers His Two Cents On Patents.

In spring 2005, as part of the patent cleanup process, Yudell reached out to Stewart to obtain his signature on certain patent amendments. Stewart "hadn't really thought about Wayport for several years," but Yudell's inquiry sparked his interest. Tr. 98. On May 17, Stewart sent an email to the Board and management containing a lengthy and unsolicited strategic manifesto about how Wayport could monetize its patent portfolio.

I have seen no evidence of any attempt by Wayport to enforce [its] ever increasingly valuable patent assets. Indeed, I would be surprised if the ability to enforce the patents [was] not to some extent already limited by either direct licenses, covenants not to sue, or implicit licenses under the patent exhaustion doctrine as a part of other deals Wayport has done with [carriers].

. . . .

However, there is more to IP strategy than waiting defensively to be sued, or offensively suing someone. I would like here to propose a set of strategic actions in this regard. Four years ago, [Vucina] asked me to make such a proposal, and I could not think of a good one. But today, many things have changed. So I herewith have two trivial and one significant patent asset management strategies to propose. My credentials for these proposals are threefold: I am a significant shareholder with a desire to see Wayport maximize value of all assets, I am a named inventor on all of Wayport's system and method patents, and I pretty much only did technology IP strategy and deals globally for AMD during the five years prior to starting Wayport. . . .

I can quickly dispose of the trivial:

1. Abandon any investment, including fees, in [patent A] if you have not already done so. . . .

2. Offer to sell [patent] 6732176 to Cisco. . . . The cash benefit to Wayport could be relatively immediate and significant. However, I don't see how Wayport would need to continue to invest in this patent over time—it is about gear, and not about service. . . . Regarding value of this patent, I would propose you start at 5% of actual or forecast[ed] sales, and settle for 2% or some NPV equivalent of 2%. This could be many hundreds of thousands of dollars. . . .

3. Far more interesting is the profound component of strategy I would like to propose regarding the remaining system and method patients.

The big change in the environment from 2000/2001 is the presence of municipali-

ties operating wifi networks. Some or all of these will infringe [patent B] and its progeny. But you can enforce patents against a government with a degree of impunity not available when contemplating enforcement against customers, suppliers, or competitors.

. . . .

As I see it there are three approaches:

— [D]o nothing, wait for more infringement

— [D]o the 'little fish/big fish' dance, well known to technology IP strategists. Under this approach Wayport would find a small municipality somewhere (the little fish) operating a municipal wifi network, approach them, say 'hey you know what? You infringe my patents. But [don't] worry, I am not trying to shut you down. Why [don't] you just give me $500 and I'll give you this license. Then you never have to worry about this again.'

Next, find a slightly bigger fish, and repeat at a slightly higher price, saying 'municipality A needed a license, and so do you.' Repeat. Repeat. Repeat. . . .

— The third approach is my personal favorite. If you know who you'd do this with, and [carrier A] or [carrier B] come directly to mind, . . . just go to their IP section and lay out the strategy, and use the NPV of the strategy to add to valuation discussions either with private or public markets. The neat thing about this approach is that you can directly get valuation from a carrier who would like to control the patent assets. . . . .

The courtesy of a response to these suggestions would be greatly appreciated.

JX 8 (the "Patent Strategy Memo"). As these excerpts indicate, the tone of the Patent Strategy Memo was not entirely complimentary towards Wayport management. But for Stewart's emails, which tend toward the prickly and condescending, it was relatively subdued. The 6,732,176 patent referenced in the Patent Strategy Memo was one of the chief patents in a family (the "MSSID Patents") that Wayport would sell to Cisco Systems, Inc. ("Cisco") in a transaction that serves as the foundation for much of the plaintiffs' case.

On the same day he received the Patent Strategy Memo, Wayport's then-general counsel, Bob Kroll, sent a brief email thanking Stewart "for [his] time and for sharing [his] thoughts." JX 9. He then referred to a patent monetization strategy and team:

We are aggressively pursuing a patent monetization strategy and will give due consideration to the suggestions you have set forth below. No doubt many ideas for deep consideration are contained in it, but time constraints limit my ability to fully consider them right now. They will be shared with the patent monetization team once it is in place, which should be within the near future.

Again, thank you for your continuing interest in Wayport's success.

*Id.* Kroll copied Stewart, Vucina, Heinen, other members of the Board, and Yudell.

Wayport's Chief Technology Officer at the time, Dr. James Keeler, also replied to Stewart, but cautioned that any patent strategy would take time.

Thank you for your thoughts. We view the patent portfolio as being a valuable asset and I have been nurturing this asset in the U.S. and in selected international locations. . . .

The actual strategy of what to do with [the patents] is a complex one that tends to move slowly—when I was involved in licensing the patent portfolio at Pavilion . . . it took about 4 to 5 years from start to finish, $5 million of investment, and

resulted in about $30Million [sic] licensing fees after 2 lawsuits....

Under [Kroll's] leadership we are engaging several firms regarding our strategy for how to monetize this asset and we expect to have a plan put in place within the next six months or so. However, it will be a multi-year process to actually monetize....

I will say that the value of your patents has not gone unnoticed by me, the board or our lawyers. It is being worked on and strategies are being developed.... There is a lot of work to do to tap into that mine, however, and it takes a lot of time for these things to become monetized.

... [W]e are approaching this in a very structured and professional manner that we expect will optimize the value of the good work that you have done in the past.

JX 10.

Long also responded to Stewart:

Thanks for prodding us on this, and for laying out the issue more clearly. It's clear to all of us that Wayport's patents have value, but as you know the issue has been how and when to best realize that value. Your idea is interesting and worth examining closely.

JX 15.

To me, these communications appear professional and courteous. To Stewart, they were disingenuous, and he concluded that the Board had no concept of the patent portfolio's value. In an email to Heinen, Stewart summarized his reaction. "As a person literate in the English language, it is safe to assume there is no patent monetization activity underway, just glib lip service." JX 15. At trial, Stewart testified to the same effect. He believed that Wayport had brushed aside the Patent Strategy Memo and had no alternative patent strategy. *See* Tr. 176–77 (Stewart agreeing that "regardless of what the company was telling [him] through several different voices, [he] made a decision personally simply not to give credit to that information").

Despite what Stewart perceived to be a dismissal of his recommendations, Long and Stewart continued discussing the Company's patents. In summer 2005, they met for lunch, but the meeting ended badly when Long became "annoyed at what [he] took as [Stewart's] zings against Wayport and its board...." JX 27. After this difficult encounter, Long reached out to Stewart again in fall 2005. Yudell was nearing the end of his housekeeping efforts and starting to develop a formal marketing plan, and Long hoped to tap Stewart's expertise. On October 21, Long emailed Stewart:

I would like to follow up with you about your ideas on how Wayport can best exploit its IP portfolio. This has become a higher priority for [Vucina] and the board, and [Vucina] acknowledges that you are uniquely qualified by background and talent to help with these efforts. The company has not been completely idle here, although I know we have not moved as quickly as you would have liked or followed your suggestions around IP strategy. The board is scheduled to hear presentations in a couple of weeks from two outside IP firms to get their assessments of the Wayport portfolio and their thoughts around exploitation strategies.

*Id.* Long asked whether Stewart would "be willing to look into this matter and help us" and suggested that there appeared to be "a real opportunity to drive meaningful value to Wayport...." *Id.* He suggested that Stewart and the Company "look past [their] disagreements and frictions...." *Id.*

Stewart replied the same day and reiterated his criticisms of Vucina and the Company, including what he described as its failures to honor his requests for information even when he complied with the Section 220 Policy. While acknowledging Wayport's efforts, Stewart denigrated the strategy of using brokers to market and sell the patents.

> Indeed, I view the process you describe, of outside law firms presenting ("pay me fees and I will go ask for licenses in the following way") as one where I could hardly add value, likely to have the prospect of consuming inordinate amounts of my (uncompensated) time, and unlikely to do anything significant for shareholder value in the time frame of interest. I have seen this movie and I know how it ends.

JX 27. In subsequent emails, Stewart offered more heated assessments of how Wayport had treated him and whether its patent strategy was likely to succeed.

On November 11, 2005, Long again informed Stewart that Wayport was taking his suggestions seriously and would soon act.

> While [Vucina] may not have moved as quickly as you would have liked, and may not have the technology background to understand the issues, opportunities and strategies as completely as you would like, I can assure you that he now has a sense of urgency on this topic and is marshalling resources to move quickly.

JX 33. In the same email, Long asked Stewart to be more constructive and suggested that he stop any independent efforts to reach out to industry contacts about Wayport's patents. Long expressed concern that a dual track sales process, one managed by Wayport and one conducted independently by Stewart, would undermine the Company's efforts.

> I believe that your proposed independent activities with potential partners risk greater potential harm than potential gain. I am confident that the value of Wayport's IP will get communicated to the appropriate people.... In pursuing this course you would also be taking a position that the company could only view as adversarial, an outcome I think would be very unfortunate.

*Id.* Stewart reserved his right to do whatever he wanted, and the discussions between Stewart and Long stopped.

### E. The First Stock Sale

In November 2005, Max Chee, a principal at Millennium Technology Value Partners, L.P. ("Millennium") contacted Stewart and Gray about their shares of Wayport common stock. Millennium is a venture capital fund that invests in founders' shares. Chee asked whether Stewart and Gray might be interested in liquidating a portion of their Wayport common stock.

Stewart was initially suspicious. Coming on the heels of his exchanges with Long about the patents, he thought there was "zero chance [Chee] [did] not have Wayport's hand up his back." JX 37. But less than a month later, Stewart, Heinen, and Gray signed letters of intent to sell a portion of their Wayport common stock to Millennium at $3.00 per share. Stewart, Heinen, and Gray initially agreed to sell 184,000 shares. In January 2006, plaintiff Paul Koffend, formerly Wayport's CFO during Stewart's tenure as CEO, caught wind of the opportunity and asked to sell some of his shares to Millennium on the same terms.

The contemplated sales could not close immediately because of the ROFRs held by Wayport, Trellis, and NEA. When the sellers gave notice of their intent to sell,

Wayport and NEA declined to exercise their rights, but Trellis sought to buy.

A dispute then ensued between Stewart and Trellis. Stewart's shares ostensibly were covered by multiple iterations of a stockholder agreement that contained various other ROFRs, but the parties to the iterations were different and Stewart was not a signatory to the later versions, including the version that Trellis believed was operative. To Trellis's dismay, Stewart began sending ROFR notices to parties under the last version of the stockholder agreement that he signed, including parties that Trellis believed were not entitled to notice. Stewart also objected to the shares being purchased by a Trellis fund that was not a signatory to the agreement he deemed controlling and therefore, in his view, did not have a ROFR.

After much wrangling and considerable delay, Williams came up with a solution. Each version of the ROFR permitted the affected seller, the Company, and a super-majority of the preferred stockholders to waive any provision of the agreement. As long as the necessary votes could be obtained, the ROFRs could be waived, avoiding the need to determine which version of the stockholder agreement was actually controlling. The parties followed this course.

Everything was proceeding towards a closing until March 9, 2006, when Trellis backed out. According to Broeker, Trellis decided to invest in other portfolio companies. Trellis's decision did not affect the plaintiffs because Millennium stepped in to buy their shares. In late March, Millennium acquired 527,500 shares from the plaintiffs.

## F. Wayport Markets The MSSID Patents.

At some point in 2006, Wayport Executive Vice President Greg Williams assumed responsibility for executing Wayport's patent strategy. In the fall, Greg Williams told Vucina that he wanted Wayport to be in good faith negotiations for a license to the MSSID Patents by April 1, 2007.

Consistent with this goal, Wayport began marketing the MSSID Patents in February 2007. Yudell distributed offering materials to approximately sixty potential buyers and asked for initial indications of interest by the end of March. Only two parties submitted indications of interest: Cisco and Intellectual Ventures Management, LLC ("Intellectual Ventures"), an investment firm focused on intellectual property.

## G. The Second Stock Sale Begins.

In December 2006, shortly before the auction for the MSSID Patents commenced, Stewart contacted Wayport about selling more stock to Millennium. The transaction was anticipated to close on substantially similar terms, including a $3.00 sale price. Stewart asked if Williams wanted to handle the ROFR issues through the waiver process. On December 13, Stewart followed up with an email in which he informed Williams that the selling stockholders preferred the waiver approach. The same day, Stewart and Williams spoke by phone, and Williams suggested that Trellis and NEA would likely agree to waive their ROFRs if plaintiffs made enough shares available such that Trellis and NEA could participate. Stewart alluded to this conversation in an email to Williams on December 14:

> I was thinking over our conversation yesterday, and after a few discussions among the [plaintiffs], I would like to indicate to you the potential flexibility to increase the number of shares available, should one of the [preferred stockholders] have an interest in taking an additional position. I don't have a number, I

just want to communicate receptivity to discussing this, *should it turn out that one of the issues in getting a waiver . . . is, as you anticipated, the desire for one of the [preferred stockholders] to co-buy.*

JX 145 (emphasis added). Williams responded: "Thanks [Stewart]. It does help." *Id.* Later that week, Williams confirmed that Wayport was willing to proceed by waiver, but he still needed to coordinate with Trellis and NEA.

On December 20, 2006, Long emailed the Board and noted that there were two directors, Katzen and McCormick, who wanted to purchase shares. Long described how Williams planned to satisfy everyone's desires.

> [Williams] has concluded it doesn't make sense to intervene in the current proposed sale, but rather to see if the [plaintiffs] would sell an additional 200–250k shares directly to [Katzen and McCormick]. [Williams] also learned from Greg Williams that he would be interested in selling 100k of his shares, which would reduce the request to the [plaintiffs].

JX 149. Caught off-guard, Vucina emailed Williams and asked why he made this "formal recommendation." JX 150. Williams downplayed the idea of a "formal recommendation" but did not dispute that requesting additional shares from the plaintiffs was his idea.

> I had originally been thinking of this as a two step (company buys and then sells to directors) approach as well. Different approach of facilitating the sales directly came into the discussion yesterday and has the appeal of keeping the Company out of the transaction. . . . I was still forming my thinking around that yesterday but it is settling in as a better simpler [sic] approach.

*Id.* Under Williams's structure, the plaintiffs and Greg Williams would sell directly to Katzen and McCormick.

Williams conveyed his proposal to Stewart, who agreed. On January 25, 2007, Williams supplied the parties with a draft stock purchase agreement. Around this time, Trellis and NEA decided not to participate in the second stock sale, at least while the going-rate was $3.00 per share.

## H. Millennium Lowers Its Bid.

On January 31, 2007, Millennium asked Wayport for financial information to help evaluate the proposed transactions. The record does not contain direct evidence of what Millennium received or learned, but on February 13, Millennium told Stewart that it was dropping its price to $2.50. Stewart vented to Williams: "I learned yesterday evening that . . . [Millennium] received new information from Wayport that was unavailable to the [plaintiffs], and that as a consequence of that information and subsequent questioning of management, [Millennium] would decline to perform the stock transfer [at $3.00 per share]." JX 171. Stewart asked Williams to give him the same information to "restore [the] balance of information available." *Id.*

Williams forwarded Stewart's email directly to Millennium, remarking that Stewart's communication was his "morning surprise." JX 171. Williams and Millennium spoke by phone twenty minutes later. Williams also gave a heads up to Vucina, who was upset that Millennium had acted without warning the Company. Vucina commented:

> One of the things I don't understand is the need for [Millennium] to share this level of information with [Stewart]. I don't feel like we should have any more of these conversations with [Millennium] if they are going to turn around and

communicate back to [Stewart] in this manner.... [T]hey have put us in a tough position.

JX 173.

Williams did not respond to Stewart until after his communications with both Millennium and Vucina. On February 15, 2007, Williams decided that Stewart would get "exactly what [Millennium] got." JX 174. Wayport sent Stewart the additional information and set up a call between Stewart and Wayport's CFO, Ken Kieley, which took place on February 27.

Meanwhile, Williams continued acting as an intermediary for the stock sales. On February 16, 2007, Williams facilitated the exchange of draft stock purchase agreements between Stewart and McCormick. On February 21, Stewart asked Williams whether Trellis and NEA were interested in buying stock at the new price, and Williams responded "definitely." JX 186. On February 28, Stewart confirmed to Williams and Millennium that plaintiffs would still sell at $2.50 per share. To generate the same proceeds, Gray increased the number of shares he would make available by 20,000 shares. On March 1, Williams reported on these developments to the Board.

On March 2, 2007, Greg Williams learned that Millennium had lowered the price from $3.00 to $2.50. He declined to sell at the new price. On March 7, Stewart and Williams worked out a ledger reflecting Greg Williams's withdrawal.

Because the price had changed, the revised stock sales at $2.50 per share required a new ROFR waiver. On March 8, Wayport waived the Company's ROFR, but Trellis and NEA now indicated that they wanted to buy.

To keep everyone happy, Williams stepped in. He first determined the preferred stockholders' investment appetites. Once this figure was known, Williams asked Stewart whether the plaintiffs would make additional shares available to accommodate both the preferred stockholders and Millennium, indicating that it would enable him to procure the ROFR waivers. When Stewart agreed, Williams contacted Trellis and NEA to confirm that if the plaintiffs made additional shares available, the extra shares could go to Millennium. When they agreed, Williams believed he had a transaction in which the ROFRs could be waived, and Trellis, NEA, and Millennium would be able to participate.

## I. The Auction Generates Two Bidders.

While Williams and Stewart were putting together the stock sales, the auction results came in for the MSSID Patents. On March 30, 2007, Cisco submitted a "non-binding indication of interest" suggesting a transaction price in a "range" of $1–10 million, subject to "Cisco's evaluation of relevant market factors," "due diligence," and negotiation of a "definitive agreement." JX 211. Attached to the indication of interest was an extensive list of due diligence requests. Greg Williams understood Cisco to be closer to the $1 million figure.

On April 3, 2007, Intellectual Ventures submitted a "preliminary, non-binding indication of interest" suggesting a transaction price "between $1.5 and $2.25 million." JX 212. Intellectual Ventures also asked about purchasing an additional patent for $500,000. *Id.* The Intellectual Ventures indication of interest was subject to "due diligence" including "the review of complete file histories, relevant prior art, [and] pre-existing licenses...." *Id.*

Yudell tried to negotiate the bidders up. Cisco balked at his initial counteroffer of $12–17 million, so he proposed a "non-exclusive license" requiring an "up-front payment" of $8 million. JX 234. On May

17, 2007, Yudell sent Cisco's counsel a non-binding term sheet reflecting Wayport's counteroffer. Cisco went silent, and Greg Williams thought Yudell had overplayed his hand.

Negotiations with Intellectual Ventures progressed more smoothly. By June 8, 2007, Intellectual Ventures had proposed a transaction that included a $5 million upfront payment and future royalties. Wayport countered with a new term: the deal would be conditioned on a license for "a large networking equipment manufacturer," namely Cisco. JX 252. Greg Williams's contemporaneous emails suggest he thought the condition might cause Intellectual Ventures to believe it faced competition and increase its bid. But Intellectual Ventures never agreed to the condition and never raised its price.

Meanwhile, Greg Williams reached out to Cisco to restart negotiations. On June 14, 2007, he reported to the Board on his efforts, and the directors formally authorized him to reopen discussions. After the meeting, Greg Williams offered to sell the MSSID Patents to Cisco for $10 million, subject "to Cisco's sole satisfaction with its due diligence . . . ." JX 257.

On June 18, 2007, Greg Williams sent Cisco a proposed sale agreement. Cisco rejected Wayport's form of the agreement and supplied its own, without specifying a price. On June 20, Wayport began providing Cisco with due diligence. Eight days later, on June 28, Cisco finally named a price: $9 million. Greg Williams countered, and Cisco and Wayport reached agreement at a price of $9.5 million. The agreement was executed on June 29.

The sale of the MSSID Patents was a major achievement for Wayport. After paying Yudell's success fee, Wayport received $7.6 million in cash. The proceeds increased the Company's year-end cash position by 22%, and the gain on sale represented 77% of the Company's year-end operating income. On July 2, 2007, Vucina notified the Board. The directors received detailed materials about the Cisco sale on July 20 and gathered for a Board meeting on July 25 where Greg Williams provided a formal update. No one at Wayport said anything about the sale of the MSSID Patents to the plaintiffs.

## J. The Second Stock Sale Closes.

In late March 2007, as bids for the MSSID Patents arrived, Stewart was growing increasingly frustrated with the delays in closing the second stock sale caused by Trellis and NEA deciding how many shares to purchase. On April 9, NEA indicated that it would purchase 200,000 shares. Trellis originally indicated that it would purchase 400,000 shares, but reduced its ask to approximately 300,000 shares as a courtesy to NEA. Katzen and McCormick would purchase 270,000 shares in the aggregate. Millennium would purchase the balance. On April 24, with the transaction structure finalized, Wayport waived its ROFR.

On April 25, 2007, Stewart and Koffend sold shares to Millennium. On May 9, a sufficient number of preferred stockholders executed ROFR waivers to facilitate the remainder of the transactions. The same day, Williams's paralegal circulated Wayport's draft stock purchase agreement.

For the sales to the directors, Williams negotiated the terms of the stock purchase agreement with Williams's paralegal. Stewart asked that certain buyer-friendly language be removed, and Williams agreed. Stewart had more difficulty with Trellis. Trellis's outside counsel tried to add language to the stock purchase agreement reciting that the parties were operating with equal information, but Stewart

objected. On June 8, 2007, after Stewart and Trellis's counsel reached an impasse, Broeker weighed in:

> We cannot have a one sided representation.... I think [Trellis's counsel] has outlined a number of solutions which are attempting to address comfort so we can have symmetry in the [representations]. He indicated we'd be happy to [represent] a number of items. *We are not aware of any bluebirds of happiness in the Wayport world right now and have graciously offered to [represent] that.* But what happens if Google walks in in 30 days and says "we'd like to buy [Wayport]". [sic] The way the [representation] is worded, you would come to us and say foul—you should have told me. I think we can address this but we need to focus on solutions that will meet [Wayport's] guidance for existing investors and [B]oard members and our counsel.

JX 248 (emphasis added). In response, Stewart emailed Broeker, saying that "[i]f you know of a Google deal in play, perhaps you ought to refrain from this transaction, or arrange for us to be on a level information playing field." JX 246.

At trial, this "bluebirds" email was hotly disputed. Stewart testified that he understood "bluebirds" to mean any unspecified good news. Broeker testified that it meant an acquisition. Having heard the witnesses and considered the email in context, I agree with Stewart. Broeker's reference to an acquisition was just one example of a potential bluebird. During his deposition, Greg Williams volunteered an example of another "great big bluebird"— a patent sale in the range of the Cisco sale. Greg Williams Dep. Tr. 64–65.

Later that day on June 8, 2007, Broeker attempted to break the logjam with Stewart by providing him with a copy of a stock purchase agreement that Trellis entered into with Dave Hampton, a former Wayport employee. Broker pointed out that Hampton was "no longer at the company and doesn't receive financial information," but he agreed to the "mutual representations" that Trellis wanted. JX 247. Broeker offered: "If you feel you do not have the correct information to make an informed selling decision, we stand by ready to provide whatever we can to help you make an informed decision." *Id.* Neither the agreement nor the offer mollified Stewart, who remained concerned about being at an information disadvantage. Ultimately Trellis and Stewart executed a stock purchase agreement that did not contain any representations about information.

On June 13, 2007, Stewart closed his sale of stock with NEA. On June 14, Katzen and McCormick backed out of their purchases, leaving Stewart with 270,000 shares that he had planned on liquidating. On June 20, Stewart, Heinen, and Gray closed their sales with Trellis.

## K. The Third Stock Sale

On June 26, 2007, Stewart emailed Williams and stated that he was "contemplating asking for [William's] assistance in mitigating the effect of [Katzen and McCormick] bolting." JX 272. First, though, he asked for "a copy of the 11–months to date" current fiscal year unaudited financial statements. *Id.* Williams sent the materials the following day. Recall that at the time, Greg Williams had reengaged with Cisco. On June 28, Cisco offered $9 million for the MSSID Patents, and on June 29, the parties executed a patent sale agreement at a price of $9.5 million. Williams never informed Stewart of these developments.

On July 2, 2007, Stewart confirmed that he wanted to sell additional shares and asked Williams for his "assistance in recov-

ering from the 11th-hour departure of [Katzen and McCormick]." JX 281. Williams initially suggested that Stewart reach out to Trellis and NEA directly. Stewart wrote back:

> If you would like to change the flow of communication over the last six months, where the company interposed itself between the preferred [stockholders] and the [plaintiffs] until the actual transfer was about to occur, that is OK by me. I am happy to contact Trellis and NEA, but I suspect we will quickly be back to where we are now.

JX 290. Williams then contacted Trellis and NEA and advised them that Stewart wanted to sell additional shares at a price of $2.50 per share. After several weeks of internal discussions, Trellis and NEA decided to purchase 100,000 and 150,000 shares, respectively. The parties agreed to use the same versions of the stock purchase agreement previously used. On September 27 and 28, the transactions closed.

## L. Stewart Learns Of The Patent Sale.

On October 1, 2007, just days after the final stock sale, Stewart asked Williams for a copy of Wayport's audited financials. On October 30, Williams provided them. Buried in the notes was the following three sentence disclosure:

> In June 2007, Wayport completed the sale of certain of its patents related to a distributed network communication system which enables multiple network providers to use a common distributed network infrastructure. Cash proceeds of $7.6 million, net of expenses related to the transaction, were received in June 2007. The Company has no ongoing obligations under the patent sale agreement and was granted a royalty-free, nontransferable license to the related patents sold.

JX 316. This was the first time Stewart learned of the patent sale.

At his deposition, Williams testified that he was upset that even this limited disclosure was included in the financial statements. Williams opposed making any disclosure about the sale, citing the need to respect Cisco's confidentiality. Williams also testified that he ultimately agreed to the disclosure only because Wayport's auditors told him that they "really didn't have an alternative...." Williams Dep. Tr. 207–08. If the auditors had not insisted on following GAAP, Stewart might never have learned about the sale.

On November 6, 2007, Stewart asked Williams about the purchase, including "who bought them?" JX 318. Williams refused to divulge anything, citing a confidentiality agreement between Cisco and Wayport. Stewart then pared back his request, agreed to forego the name of the buyer, and asked for only (i) whether one or more patents were sold, (ii) whether any pending patents were sold, (iii) the date of the sale, and (iv) the gross sale proceeds. Williams would not budge, and Wayport provided nothing.

On December 21, 2007, Stewart made formal demand under Section 220. When Wayport failed to respond, he filed a books and records action on January 3, 2008. On March 10, Wayport provided Stewart with a list of its *currently held* patents, which enabled Stewart to deduce which patents were sold. Wayport did not disclose the gross proceeds, the timing, or the purchaser. Wayport continued to withhold this information even after Cisco filed a patent amendment with the USPTO that publicly identified Cisco as the purchaser of the MSSID Patents.

## M. AT & T Purchases Wayport.

On November 6, 2008, Wayport announced that it would be acquired by AT

& T Inc. and its common stock would be converted into the right to receive $7.20 per share. The plaintiffs were informed of the transaction upon announcement. The discussions with AT & T began just months after Stewart completed his final stock sale. The AT & T transaction closed on December 11, 2008.

### N. The Plaintiffs Sue.

On November 17, 2008, Stewart filed this litigation. As amended, his complaint contained seven counts:

- Count I—Breach of the fiduciary duty of disclosure;
- Count II—Breach of the fiduciary duty of loyalty;
- Count III—Common law fraud;
- Count IV—Civil conspiracy;
- Count V—Aiding and abetting a breach of fiduciary duty;
- Count VI—Unjust enrichment;
- Count VII—Breach of the implied covenant of good faith and fair dealing.

In the Dismissal Opinion, Vice Chancellor Lamb dismissed all claims with respect to any stock sales that took place before 2007. He also dismissed Counts I, IV, VI, and VII with respect to the 2007 stock sales. The motion to dismiss Counts II and III was denied as to defendants Wayport, Williams, Trellis, and NEA. The motion to dismiss Count V was denied as to Wayport. Dismissal Op. at *8–10.

After discovery, the plaintiffs moved to amend their complaint to add a claim for equitable fraud. Leave was granted on the grounds that all of the elements of equitable fraud are subsumed within the elements of common law fraud and therefore were already at issue in the case. *See* Ct. Ch. R. 15(a) ("leave [to amend] shall be freely given when justice so requires"); *Ikeda v. Molock,* 603 A.2d 785, 788 (Del. 1991) (finding reversible error and order-

ing new trial where trial court failed to permit amendment of the pleadings on the morning of trial); *see also Bellanca Corp. v. Bellanca,* 169 A.2d 620, 622 (Del.1961) (affirming grant of leave to amend mid-trial under Ct. Ch. R. 15(b) where additional theory of liability did not require "additional evidence" and thereby posed "no possible prejudice").

## II. LEGAL ANALYSIS

The Dismissal Opinion located this case at "an interesting intersection of contract, fiduciary duty, and fraud." Dismissal Op. at *8. In making this comment, Vice Chancellor Lamb assumed based on the allegations of the complaint that the ROFRs would play a significant role and that only the Company had waived its ROFR. *Id.* at *1. Trial simplified matters, because the plaintiffs proved that all of the parties waived all of their ROFRs. By executing the Waivers of Rights of First Refusal and Co–Sale that Williams prepared, Wayport, Trellis, NEA, and the plaintiffs relinquished "all rights of first refusal and co-sale" with respect to the sale transactions. JX 154; *see also* Pre-trial Order ¶¶ 65–66, 80–81. Default common law principles therefore apply. The plaintiffs have advanced two principal theories of liability: breach of fiduciary duty and fraud.

### A. The Claim For Breach Of Fiduciary Duty

The plaintiffs contended at trial that Trellis, NEA, Williams, and Wayport breached their fiduciary duties of loyalty. The plaintiffs did not carry their burden of proof, and judgment is entered in favor of the defendants on the fiduciary duty claim.

### 1. The Nature Of The Fiduciary Duty Claim

 The plaintiffs contended that the defendants owed them fiduciary duties

that included a duty to disclose material information when they purchased the plaintiffs' shares. Directors of a Delaware corporation owe two fiduciary duties: care and loyalty. *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del.2006). The "duty of disclosure is not an independent duty, but derives from the duties of care and loyalty." *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del.2009) (internal quotation marks omitted). The duty of disclosure arises because of "the application in a specific context of the board's fiduciary duties...." *Malpiede v. Townson*, 780 A.2d 1075, 1086 (Del.2001). Its scope and requirements depend on context; the duty "does not exist in a vacuum." *Stroud v. Grace*, 606 A.2d 75, 85 (Del.1992). When confronting a disclosure claim, a court therefore must engage in a contextual specific analysis to determine the source of the duty, its requirements, and any remedies for breach. *See* Lawrence A. Hamermesh, *Calling Off the Lynch Mob: The Corporate Director's Fiduciary Disclosure Duty*, 49 Vand. L.Rev. 1087, 1099 (1996). Governing principles have been developed for recurring scenarios, four of which are prominent.

■ The first recurring scenario is classic common law ratification, in which directors seek approval for a transaction that does not otherwise require a stockholder vote under the DGCL. *See Gantler v. Stephens*, 965 A.2d 695, 713 (Del.2009) (describing ratification in its classic form); *id.* at 713 n. 54 (distinguishing "the common law doctrine of shareholder ratification" from "the effect of an approving vote of disinterested shareholders" under 8 *Del. C.* § 144). If a director or officer has a personal interest in a transaction that conflicts with the interests of the corporation or its stockholders generally, and if the board of directors asks stockholders to ratify the transaction, then the directors

have a duty "to disclose all facts that are material to the stockholders' consideration of the transaction and that are or can reasonably be obtained through their position as directors." Hamermesh, *supra*, at 1103. The failure to disclose material information in this context will eliminate any effect that a favorable stockholder vote otherwise might have for the validity of the transaction or for the applicable standard of review. *Id.; see Gantler*, 965 A.2d at 713 ("With one exception, the 'cleansing' effect of such a ratifying shareholder vote is to subject the challenged director action to business judgment review, as opposed to 'extinguishing' the claim altogether (*i.e.*, obviating all judicial review of the challenged action)."); *id.* at 713 n. 54 ("The only species of claim that shareholder ratification can validly extinguish is a claim that the directors lacked the authority to take action that was later ratified. Nothing herein should be read as altering the well-established principle that void acts such as fraud, gift, waste and ultra vires acts cannot be ratified by a less than unanimous shareholder vote.").

■ A second and quite different scenario involves a request for stockholder action. When directors submit to the stockholders a transaction that requires stockholder approval (such as a merger, sale of assets, or charter amendment) or which requires a stockholder investment decision (such as tendering shares or making an appraisal election), but which is not otherwise an interested transaction, the directors have a duty to "exercise reasonable care to disclose all facts that are material to the stockholders' consideration of the transaction or matter and that are or can reasonably be obtained through their position as directors." Hamermesh, *supra*, at 1103; *see Stroud*, 606 A.2d at 84 ("[D]irectors of Delaware corporations [have] a fiduciary duty to disclose fully and

fairly all material information within the board's control when it seeks shareholder action."). A failure to disclose material information in this context may warrant an injunction against, or rescission of, the transaction, but will not provide a basis for damages from defendant directors absent proof of (i) a culpable state of mind or non-exculpated gross negligence, (ii) reliance by the stockholders on the information that was not disclosed, and (iii) damages proximately caused by that failure. *See Loudon v. Archer–Daniels–Midland Co.,* 700 A.2d 135, 146–47 (Del.1997).

■■■■ A third scenario involves a corporate fiduciary who speaks outside of the context of soliciting or recommending stockholder action, such as through "public statements made to the market," "statements informing shareholders about the affairs of the corporation," or public filings required by the federal securities laws. *Malone v. Brincat,* 722 A.2d 5, 11 (Del. 1998). In that context, directors owe a duty to stockholders not to speak falsely:

> Whenever directors communicate publicly or directly with shareholders about the corporation's affairs, with or without a request for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith and loyalty. It follows *a fortiori* that when directors communicate publicly or directly with shareholders about corporate matters the *sine qua non* of directors' fiduciary duty to shareholders is honesty.

*Id.* at 10. "[D]irectors who knowingly disseminate false information that results in corporate injury or damage to an individual stockholder violate their fiduciary duty, and may be held accountable in a manner appropriate to the circumstances." *Id.* at 9; *see id.* at 14 ("When the directors are not seeking shareholder action, but are deliberately misinforming shareholders about the business of the corporation, either directly or by a public statement, there is a violation of fiduciary duty."). Breach "may result in a derivative claim on behalf of the corporation," "a cause of action for damages," or "equitable relief...." *Id.*

■■■■ The fourth scenario arises when a corporate fiduciary buys shares directly from or sells shares directly to an existing outside stockholder. Hamermesh, *supra,* at 1103. Under the "special facts doctrine" adopted by the Delaware Supreme Court in *Lank v. Steiner,* 224 A.2d 242 (Del.1966), a director has a fiduciary duty to disclose information in the context of a private stock sale "only when a director is possessed of special knowledge of future plans or secret resources and deliberately misleads a stockholder who is ignorant of them." *Id.* at 244. If this standard is met, a duty to speak exists, and the director's failure to disclose material information is evaluated within the framework of common law fraud. If the standard is not met, then the director does not have a duty to speak and is liable only to the same degree as a non-fiduciary would be. It bears emphasizing that the duties that exist in this context do not apply to purchases or sales in impersonal secondary markets. *See* Hamermesh, *supra,* at 1153 & n. 296. Transactions in the public markets are distinctly different. *See, e.g., In re Am. Int'l Gp., Inc.,* 965 A.2d 763, 800 (Del.Ch.2009), *aff'd,* 11 A.3d 228 (Del.2011) (TABLE); *In re Oracle Corp.,* 867 A.2d 904, 932–33, 953 (Del.Ch.2004), *aff'd,* 872 A.2d 960 (Del.2005); *Guttman v. Huang,* 823 A.2d 492, 505 (Del.Ch.2003).

The current case originally raised the second, third, and fourth scenarios, but only the fourth remains. Count I of the complaint was titled "Breach of Fiduciary Duty of Disclosure." Dkt. 25 at 20. At the motion to dismiss stage, it was under-

stood to invoke the second scenario, *viz.*, the duty of disclosure in the context of a request for stockholder action. Vice Chancellor Lamb dismissed Count I on the grounds that "a call for an individual stockholder to sell his shares does not, without more, qualify as a call for stockholder action." Dismissal Op. at *6 n. 18.

Count II of the complaint was titled "Breach of Fiduciary Duty of Loyalty." Dkt. 25 at 21. At the motion to dismiss stage, it was understood to invoke both the third scenario (the duty under *Malone* not to engage in deliberate falsehoods) and the fourth scenario (the duty to speak that a fiduciary may have in the context of a direct purchase of shares from a stockholder). As to the former, Vice Chancellor Lamb recognized that the "corporation and its officers and directors are, of course, subject to the underlying duty of loyalty not to make false statements or otherwise materially misrepresent the facts in such a way as to defraud the stockholder in any such negotiation [over the purchase of shares]." Dismissal Op. at *6 n. 19 (citing *Malone*, 722 A.2d at 10). He held, however, that the complaint pled "no facts whatsoever to suggest that the company, or its directors or officers, made any knowingly false statements...." *Id.* He therefore dismissed Count II as to the Company and the director defendants, effectively disposing of the *Malone* claim. As to the latter, Vice Chancellor Lamb denied the motion to dismiss, holding that Count II implicated the "normal standard of fraud, *as applied to transactions between corporate insiders* ...." Dismissal Op. at *5 (emphasis added). In a footnote, Vice Chancellor Lamb contrasted this variety of fraud with "the affirmative-misrepresentation or intentional concealment species of fraud (that is, the forms of fraud that do not require a duty to speak)" that applies to non-fiduciaries. *Id.* at *5 n. 17.

This remaining aspect of Count II was litigated and tried.

## 2. The Duty Of Disclosure In A Direct Purchase By A Fiduciary

The legal principles that govern a direct purchase of shares by a corporate fiduciary from an existing stockholder have a venerable pedigree.

> As almost anyone who has opened a corporation law casebook or treatise knows, there has been for over a century a conflict of authority as to whether in connection with a purchase of stock a director owes a fiduciary duty to disclose to the selling stockholder material facts which are not known or available to the selling stockholder but are known or available to the director by virtue of his position as a director.

Hamermesh, *supra*, at 1116. Three rules were developed: a majority rule, a minority rule, and a compromise position known as the "special facts doctrine." *Id.* at 1116–17; *see also* Robert Charles Clark, *Corporation Law* § 8.8, at 306–09 (1986); Stephen M. Bainbridge, *Incorporating State Law Fiduciary Duties into the Federal Insider Trading Prohibition*, 52 Wash. & Lee L.Rev. 1189, 1219 (1995).

The "supposedly 'majority' rule disavows the existence of any general fiduciary duty in this context, and holds that directors have no special disclosure duties in the purchase and sale of the corporation's stock, and need only refrain from misrepresentation and intentional concealment of material facts." Hamermesh, *supra*, at 1116–17. Under this rule, corporate fiduciaries may

> trade like strangers at arm's length, provided they do not commit a deliberate active fraud for the purpose of procuring the shareholders' stock. They need not disclose to the shareholders important official information which they

possess, at least in the absence of inquiry. Not only the element of active misrepresentation is required, but also the reliance of the shareholders thereon as an inducement to part with their shares. Henry Winthrop Ballantine, *Ballantine on Corporations* § 80, at 212 (1946); *accord* Clark, *supra,* § 8.9, at 311 ("[T]he majority rule appears to have been that corporate directors and officers owe their fiduciary duties to the corporation, ... so that shareholders selling to an officer who purchased on the basis of inside information would ordinarily have no remedy."); 2 Seymour D. Thompson & Joseph W. Thompson, *Commentaries on the Law of Corporations* § 1363, at 885 (1927) (describing majority rule under which "a director may purchase the stock of the stockholder without disclosing to him the condition of the corporation, or without giving the stockholder the benefit of any knowledge that such director may possess in relation to the corporate affairs and affecting the value of the stock"); *see also* 3A William Meade Fletcher, *Fletcher Cyc. Corp.* § 1168.1, at 321–26 (perm ed., rev. vol.2011 & supp.2013) (collecting cases exemplifying majority rule). The majority rule was "criticized as a rule of unconscionable laxity" and "condemned by almost all text writers and commentators...." Ballantine, *supra,* § 80, at 213; *see, e.g.,* Adolf A. Berle, Jr. & Gardiner C. Means, *The Modern Corporation & Private Property,* at 327–29 (1932) (criticizing majority rule). By 1937, the majority rule arguably no longer represented the rule in a majority of jurisdictions. *See* Bainbridge, *supra,* at 1120.

"The ostensibly opposing 'minority' view broadly requires directors to disclose all material information bearing on the value of the stock when they buy it from or sell it to another stockholder." Hamermesh, *supra,* at 1117. Jurisdictions taking this approach hold that a director's fiduciary duties obligate the director to make the necessary disclosures of material information or abstain from the transaction. *See* Clark, *supra,* § 8.9, at 311; Ballantine, *supra,* § 80, at 213; Berle & Means, *supra,* at 328; Thompson & Thompson, *supra,* § 1364, at 888; *see also* Fletcher, *supra,* § 1168.2, at 326–29 (collecting cases exemplifying minority rule).

██ The special facts doctrine attempts to strike a compromise position between "the extreme view that directors and officials are always under a full fiduciary duty to the shareholders to volunteer all their information and a rule that they are always free to take advantage of their official information." Ballantine, *supra,* § 80, at 213. Under this variant, a director has a duty of disclosure only

> in special circumstances ... where otherwise there would be a great and unfair inequality of bargaining position by the use of inside information. Such special circumstances or developments have been held to include peculiar knowledge of directors as to important transactions, prospective mergers, probable sales of the entire assets or business, agreements with third parties to buy large blocks of stock at a high price and impending declarations of unusual dividends.

*Id.; see id.* at 213–14 (collecting cases exemplifying special facts rule). Like the minority rule, the compromise position recognizes a duty of disclosure, but cuts back on its scope by limiting disclosure only to that subcategory of material information that qualifies as special facts or circumstances. Berle and Means criticized the "reasoning underlying [the intermediate rule as] not particularly clear...." Berle & Means, *supra,* at 329.

In *Kors v. Carey,* 158 A.2d 136 (Del.Ch. 1960), the Delaware Court of Chancery

applied the special facts doctrine. The stockholder plaintiff alleged that the defendant directors had acted inequitably by causing the corporation to purchase the plaintiff's block of stock secretly, without revealing the corporation's identity, under circumstances where the court agreed the plaintiff would not have sold if the purchaser's true identity was known. *Id.* at 143. Then–Vice Chancellor Marvel dismissed the breach of fiduciary duty claim, explaining that

> it disregards the principle that directors generally do not occupy a fiduciary position vis à vis individual stockholders in direct personal dealings as opposed to dealings with stockholders as a class, failing to recognize that it is only in *special cases* where advantage is taken of inside information and the like that the selling stockholder is afforded relief and then on the basis of fraud....

*Id.* (emphasis added) (citations omitted). In support of this proposition, Vice Chancellor Marvel relied on two leading "special facts" cases: *Strong v. Repide*, 213 U.S. 419, 29 S.Ct. 521, 53 L.Ed. 853 (1909), and *Northern Trust Co. v. Essaness Theatres Corp.*, 348 Ill.App. 134, 108 N.E.2d 493 (1952). On the facts alleged, he found that

> the purchaser[ ] had no fiduciary or other duty in the transaction (there being no showing that the buyer had any special knowledge about the possibilities of appreciation in the market value of the purchased stock which was not basically available to the seller) other than to live up to its contract which it did. In other words, this is a case in which there is neither proof of fraud, nor of actionable willful concealment, but also no proof of a false statement innocently made.

*Kors*, 158 A.2d at 143 (citations omitted).

Six years later, in *Lank*, the Delaware Supreme Court identified *Kors* as "a decision which we expressly approve...."

*Lank*, 224 A.2d at 244. The high court then described *Kors* as holding that "the special circumstance rule applies only when a director is possessed of special knowledge of future plans or secret resources *and* deliberately misleads a stockholder who is ignorant of them." *Id.* (emphasis added). By making the test conjunctive, the Delaware Supreme Court combined the *scienter* requirement of the majority rule with a disclosure duty limited to "special facts."

*Lank* involved a privately held Delaware corporation in which two stockholder-directors were responsible for its "active management" while another stockholder, the plaintiff, was largely passive. *Id.* at 243. One of the directors learned that a third party had offered to acquire the company for $600 per share. *Id.* After learning of the offer, the director purchased an option to buy the minority stockholder's shares at $270 per share. *Id.* at 244. After the minority stockholder passed away, his heirs alleged the director breached his fiduciary duty by failing to disclose the offer to the minority stockholder when securing the option. Chancellor Seitz dismissed the complaint, finding that there was no breach of duty. *See Lank v. Steiner*, 213 A.2d 848, 851 (Del.Ch.1965).

On appeal, the Delaware Supreme Court affirmed, relying on the trial court's finding that the minority stockholder "knew of the [third party] offer since he, along with all the stockholders, signed a resolution ... authorizing the sale of corporate assets" for a price equal to the offer, prior to agreeing to the option contract. *Lank*, 224 A.2d at 244. The high court agreed that there was no evidence to "justify the conclusion that [the minority stockholder] *was not aware* of the difference" between the strike price of the option contract and the offer price, and therefore the director "had breached no duty to [the minority stock-

holder] as a corporate fiduciary." *Id.* (emphasis added). The reasoning of *Lank* suggests that without the finding of knowledge, the defendant's failure to disclose an offer for the whole company could have supported a claim for breach of fiduciary duty in connection with the option contract, although it appears that the plaintiff still would have had to show that the defendant took action or remained silent to deliberately mislead. *See id.* (stating *Kors* applies where a director fails to disclose special knowledge and "deliberately misleads" a stockholder).

Based on *Lank* and *Kors*, it appears to me that Delaware follows the special facts doctrine. Professor Hamermesh has argued that in *Lynch v. Vickers Energy Corp.*, 383 A.2d 278 (Del.1977), the Delaware Supreme Court reversed course and adopted the minority rule. *See* Hamermesh, *supra*, at 1121 ("*Lynch* . . . aligned Delaware with jurisdictions rejecting the 'majority rule' in favor of a rule recognizing a fiduciary duty on the part of directors, officers and controlling stockholders to disclose material facts, learned through their position with the corporation, to outside stockholders when buying stock from them."). In *Lynch*, then-Chancellor Marvel, the author of *Kors*, held that a majority stockholder owed a fiduciary duty of "complete candor" when purchasing shares from the minority, and he equated that obligation with the duty owed by corporate directors:

> [I]n situations in which the holder of a majority of the voting shares of a corporation, as here, seeks to impose its will upon minority stockholders, *the conduct of such majority must be tested by those same standards of fiduciary duty which directors must observe in their relations with all their stockholders*. I take this to mean that in a situation such as the one found in the case at bar that the majority stockholder here, namely Vick-

ers, had a duty to exercise complete candor in its approach to the minority stockholders of TransOcean for a tender of their shares, namely a duty to make a full disclosure of all of the facts and circumstances surrounding the offer for tenders, including the consequence of acceptance and that of refusal. . . .

*Lynch v. Vickers Energy Corp.*, 351 A.2d 570, 573 (Del.Ch.1976) (citations omitted), *aff'd in pertinent part*, 383 A.2d 278 (Del. 1977). Applying this standard, Chancellor Marvel held that disclosure violations alleged by the plaintiffs were not material. *Id.* at 574–75. On appeal, the Delaware Supreme Court reversed on the factual application, but agreed with the legal standard and the existence of a "fiduciary duty . . . which required 'complete candor.' " *Lynch*, 383 A.2d at 279. The high court explained that "[t]he objective, of course, is to prevent insiders from using special knowledge which they may have to their own advantage and to the detriment of the stockholders." *Id.* at 281. "Completeness, not adequacy, is both the norm and the mandate. . . ." *Id.*

*Lynch* did not expressly overrule either *Lank* or *Kors*, nor did it discuss the minority rule. The passage in the Court of Chancery decision that described the duty of disclosure owed by a controlling stockholder equated it with the "same standards of fiduciary duty which directors must observe in their relations *with all their stockholders*." 351 A.2d at 573 (emphasis added). It is not immediately apparent that this language refers to the duty that a director would owe when purchasing shares directly from a stockholder in a private transaction. It seems more likely to anticipate the duty of disclosure that directors owe to all stockholders when seeking stockholder action. In *Stroud*, the Delaware Supreme Court seemingly sought to clarify this very point by stating

that the "duty of candor" described in *Lynch* did not import "a unique or special rule of disclosure" but rather represented "nothing more than the well-recognized proposition that directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action." *Stroud*, 606 A.2d at 84. Subsequent Delaware Supreme Court decisions have treated the disclosure obligations of a controlling stockholder when making a tender offer or effecting a short-form merger as examples of the duty of disclosure in the context of stockholder action. *See, e.g., Berger v. Pubco Corp.*, 976 A.2d 132, 145 (Del.2009); *Glassman v. Unocal Exploration Corp.*, 777 A.2d 242, 248 (Del.2001); *Shell Petroleum, Inc. v. Smith*, 606 A.2d 112, 116 (Del.1992).

Although I agree with the policy rationales that Professor Hamermesh advances for imposing an affirmative duty to disclose material information on a director who purchases shares from or sells shares to a stockholder in a private transaction, *see* Hamermesh, *supra*, at 1151–59, it does not appear to me that the Delaware Supreme Court has endorsed this rule. Absent further guidance from the high court, the "special facts" doctrine remains the standard in this context.

### 3. No "Special Facts"

▮ Under the "special facts" doctrine, Trellis and NEA were free to purchase shares from other Wayport stockholders, without any fiduciary duty to disclose information about the Company or its prospects, unless the information related to an event of sufficient magnitude to constitute a "special fact." If they knew of a "special fact," then they had a duty to speak and could be liable if they deliberately misled the plaintiffs by remaining silent.

▮ To satisfy the "special facts" requirement, a plaintiff generally must point to knowledge of a substantial transaction, such as an offer for the whole company. *See Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 435 (7th Cir.1987) ("The 'special facts' doctrine developed by several courts at the turn of the century is based on the principle that insiders in closely held firms may not buy stock from outsiders in person-to-person transactions without informing them of new events that substantially affect the value of the stock."); *accord Lazenby v. Godwin*, 40 N.C.App. 487, 495, 253 S.E.2d 489 (1979) (third party purchase of corporation's assets at multiple of book value); *Weatherby v. Weatherby Lumber Co.*, 94 Idaho 504, 492 P.2d 43, 45 (1972) (ongoing negotiation over sale of assets "enhancing the value of the stock"); *Lank v. Steiner*, 213 A.2d 848, 851 (Del.Ch. 1965) (third party offer to purchase corporation's stock at multiple of book value), *aff'd*, 224 A.2d 242 (Del.1966); *Jacobson v. Yaschik*, 249 S.C. 577, 155 S.E.2d 601, 605 (1967) ("forthcoming assured sale of corporate assets," "an offer of purchase of the [corporation's] stocks," or a "fact or condition enhancing the value of the [corporation's] stocks"); *Fox v. Cosgriff*, 66 Idaho 371, 159 P.2d 224, 229 (1945) (liquidation "enhancing the value of the stock"); *Nichol v. Sensenbrenner*, 220 Wis. 165, 263 N.W. 650, 657 (1935) (plan of reorganization generating "fair" value above price paid by insider); *Buckley v. Buckley*, 230 Mich. 504, 202 N.W. 955, 956 (1925) ("assured sale, merger, or other fact or condition enhancing the value of the stock"); *see generally* Harold R. Smith, *Purchase of Shares of a Corporation by a Director From a Shareholder*, 19 Mich. L.Rev. 698, 712–17 (1921) (analyzing special facts cases).

Contrary to *Lank*, the plaintiffs argue that they need only show that the defen-

dants failed to disclose material information. Under Delaware law, "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important" such that "under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del.1985). The standard "does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote" or (in more generalized terms) act differently. *Id.* The standard of materiality is thus lower than the standard for a "special fact."

The plaintiffs have identified three allegedly material omissions. Only one—the Cisco sale—is material. Even this omission does not rise to the level of a "special fact."

■ The plaintiffs first argue that the Company's efforts to monetize Wayport's patent portfolio constituted material information that the defendants failed to disclose. According to the plaintiffs, the Company's decision to take concrete steps towards monetizing its portfolio represented a substantial change in corporate direction, and its stockholders should have been told. I need not decide whether this information was material or special, because in either event it was not omitted. Through his communications with Long and other members of Wayport management, Stewart learned as early as 2005 that Wayport was evaluating its patent portfolio and taking steps to monetize it. The Company even asked for his help. Stewart discussed the Company's plans and expressed his views about them to his fellow plaintiffs. Stewart did not like Wayport's strategy and did not believe the Company would really execute it, but what matters for present purposes is that he

fully understood its plan of action. The plaintiffs cannot maintain a claim for breach of the duty of loyalty in a direct stock sale based on information they actually knew. *Lank*, 224 A.2d at 244.

■ The plaintiffs next contend that the existence of the Intellectual Ventures proposal constituted material information that should have been disclosed. For purposes of Delaware law, the existence of preliminary negotiations regarding a transaction generally becomes material once the parties "have agreed on the price and structure of the transaction." *Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 847 (Del.1987); *see also Alessi v. Beracha*, 849 A.2d 939, 945–49 (Del.Ch.2004). Under these standards, the plaintiffs did not prove that the Intellectual Ventures deal ever became material. After the Board meeting on June 14, 2007, the Intellectual Ventures transaction remained a Wayport counteroffer that was subject to a carve-out for "a large networking equipment manufacturer." JX 263. Intellectual Ventures never accepted. No agreement on price and structure was reached, and the Intellectual Ventures transaction was not otherwise sufficiently firm to be material. It therefore could not rise to the level of a "special fact."

■ By contrast, plaintiffs proved at trial that the Cisco sale was material. Wayport and Cisco agreed on a total price of $9.5 million on June 29, 2007, and the patent sale agreement was signed that day. Wayport's net sale proceeds of $7.6 million increased the Company's year-end cash position by 22%, and the gain on sale represented 77% of the Company's year-end operating income. Wayport's auditors concluded that the transaction was material to Wayport's financial statements and insisted that it be included over Williams's opposition because they "really didn't have an alternative.…" Williams Dep. Tr. 207–08.

The Cisco sale was a milestone in the Company's process of monetizing its patent portfolio, and it was sufficiently large to enter into the decisionmaking of a reasonable stockholder. But the plaintiffs did not prove at trial that the Cisco sale substantially affected the value of their stock to the extent necessary to trigger the special facts doctrine. Stewart admitted that the sale of the MSSID Patents did not necessarily imply anything about the market value of the remaining patents, and he himself believed—before and after learning of the Cisco sale—that the rest of the Company's patent portfolio was still worth hundreds of millions of dollars. Tr. 182–83, 261–65; Stewart Dep. Tr. 564–68, 576–78.

Because they did not know of any "special facts," Trellis and NEA did not have a fiduciary duty to speak when purchasing shares from the plaintiffs. Judgment is entered in their favor on the breach of fiduciary duty claim.

### 4. Williams Had No Greater Duty

 Williams was an officer of Wayport, and the "fiduciary duties of offi-

cers are the same as those of directors." *Gantler*, 965 A.2d at 708–09. Although Williams did not purchase shares from the plaintiffs, I will assume for the sake of argument that Williams could have undertaken a duty to disclose based on his fiduciary status and substantial role in the transaction process. *See Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 541 (Del.1996); *Shell Petroleum*, 606 A.2d at 116. But even then, it does not seem to me that the scope of Williams's duty to speak as a transactional facilitator would exceed the duty imposed on the fiduciaries who were actual participants in the transaction. Trellis and NEA only had a duty to speak if they knew of a "special fact." For the reasons already discussed, although the Cisco sale was material information, it did not rise to the level of a special fact. Consequently, Williams did not have a duty to speak, and judgment is entered in his favor on the breach of fiduciary duty claim.[3]

### 5. The Claim Against Wayport

 Wayport is not liable for breach of fiduciary duty. As a corporate entity,

---

**3.** By contrast, a non-fiduciary aider and abetter could face different liability exposure than the defendant fiduciaries if, for example, the non-fiduciary misled unwitting directors to achieve a desired result. *See In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 838 (Del.Ch.2011). ("[U]nless post-closing discovery reveals additional facts, the plaintiffs face a long and steep uphill climb before they could recover money damages from the independent, outside directors on the Board. Admittedly other prospects for recovery are not so remote. By their terms, Sections 102(b)(7) and 141(e) do not protect aiders and abetters, and disgorgement of transaction-related profits may be available as an alternative remedy."). It is thus possible for a non-fiduciary to be liable for aiding and abetting "even if the Board breached only its duty of care" and is exculpated for that breach. *In re Celera Corp. S'holder Litig.*, 2012 WL 1020471, at

*28 (Del.Ch. Mar. 23, 2012), *aff'd in part, rev'd in part*, 59 A.3d 418 (Del.2012); *see Arnold v. Soc'y for Sav. Bancorp, Inc.*, 1995 WL 376919, at *8 (Del.Ch. June 15, 1995) (holding that plaintiffs could maintain a claim against acquirer for aiding and abetting a breach of the duty of disclosure, notwithstanding that defendant directors were protected by an exculpatory provision), *aff'd*, 678 A.2d 533, 541–542 (Del.1996) (affirming analysis and remanding for further proceedings on aiding and abetting claim); *see also In re Shoe–Town Inc. S'holders Litig.*, 1990 WL 13475, at *8 (Del.Ch. Feb. 12, 1990) (denying motion to dismiss aiding and abetting claim against financing advisor in going-private transaction where financial advisor "was closely involved with the management group, the special committee and the Shoe–Town board").

Wayport did not owe fiduciary duties to its stockholders. *See A.W. Fin. Servs., S.A. v. Empire Res., Inc.,* 981 A.2d 1114, 1127 n. 36 (Del.2009); *Arnold,* 678 A.2d at 539. The plaintiffs asserted a separate claim against Wayport for aiding and abetting Williams's breach of fiduciary duty, but without an underlying breach, the aiding and abetting claim fails. *See Malpiede v. Townson,* 780 A.2d 1075, 1096 (Del.2001). Judgment is entered in favor of Wayport.

## B. The Common Law Fraud Claim

■ As an alternative to their breach of fiduciary duty claim, the plaintiffs alleged in Count III of their complaint and contended at trial that Trellis, NEA, and Williams were liable for common law fraud. To establish a claim for fraud, a plaintiff must prove (i) a false representation, (ii) a defendant's knowledge or belief of its falsity or his reckless indifference to its truth, (iii) a defendant's intention to induce action, (iv) reasonable reliance, and (v) causally related damages. *See Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1074 (Del.1983). The plaintiffs proved that Trellis committed fraud in connection with the September 27, 2007 stock sale. Otherwise judgment is entered in favor of defendants.

### 1. A False Representation

■ The plaintiffs do not ground their fraud claim on affirmative representations but rather on material omissions. "[F]raud does not consist merely of overt misrepresentations. It may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak." *Stephenson,* 462 A.2d at 1074. The plaintiffs rely on the same three omissions that were previously analyzed in the context of the breach of fiduciary duty claim. For the reasons already discussed, only one was a material omission: the Cisco sale.

### 2. A Duty To Speak

The plaintiffs next contend, as the Dismissal Opinion held, that "the duty of loyalty may give rise to a duty to speak...." Dismissal Op. at *6. But under *Lank,* a corporate fiduciary has a duty to speak when buying or selling stock from a stockholder in a direct transaction "only when a director is possessed of special knowledge of future plans or secret resources and deliberately misleads a stockholder who is ignorant of them." 224 A.2d at 244. For the reasons discussed in Part II.A.3, none of the defendants knew about a "special fact" that gave rise to a duty to speak.

■ A duty to speak also can arise because of statements a party previously made. A "party to a business transaction is under a duty to ... disclose to the other [party] before the transaction is consummated ... subsequently acquired information that [the speaker] *knows will make untrue or misleading a previous representation that when made was true ....*" Restatement (Second) of Torts § 551 (1977) (emphasis added) [hereinafter Restatement of Torts]. The fact that a statement was true when made does not enable the speaker to stand silent if the speaker subsequently learns of new information that renders the earlier statement materially misleading.

> [H]aving made a representation which when made was true or believed to be so, [one who] remains silent after he has learned that [the representation] is untrue and that the person to whom [the representation was] made is relying upon it in a transaction with him, is ... in the same position as if he knew that his [representation] was false when made.

*Id.* cmt. h. Numerous cases apply this rule to claims of securities fraud.[4]

NEA never spoke, and hence had no duty to update an earlier statement. Williams never made any representation that subsequently became untrue. He and others at the Company consistently told Stewart to assume that the Company was actively exploring options for its patent portfolio and considering a number of different alternatives, any of which might come to fruition. Williams also informed Stewart that the Company believed the stock was worth more than the price reflected in the sale transactions.

■ Trellis, by contrast, chose to speak, and its representation later became untrue. On June 8, 2007, Trellis's managing partner, Broeker, represented in an email to Stewart that Trellis was "not aware of any bluebirds of happiness in the Wayport world right now. . . ." JX 248. Long was included on the email chain and knew that his partner had made the representation. Heinen emailed Long contemporaneously to call his attention to the contentious negotiations between Broeker and Stewart. When the email was sent, the representation was true. But by speaking, Trellis assumed a duty to update its statement to the extent that subsequent events rendered its representation materially misleading. *See* Restatement of Torts § 551.

■ Trellis's statement became materially misleading on July 2, 2007, when Vucina informed the Board via email of the Cisco sale. On July 20, Board materials were distributed which described the Cisco sale in detail. On July 25, Greg Williams gave the Board a presentation about the Cisco sale. Long thus knew about Wayport's unexpected good news and the falsity of the "bluebirds" email. Broeker did as well, because he often spoke with Long about Wayport developments and had access to Board materials through Trellis's information rights. Their knowledge is imputed to Trellis. *See Teachers' Ret. Sys. of La. v. Aidinoff,* 900 A.2d 654, 671 n. 23 (Del.Ch.2006) ("[I]t is the general rule that knowledge of an officer or director of a corporation will be imputed to the corporation."); *Albert v. Alex. Brown Mgmt. Servs., Inc.,* 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005) (imputing knowledge of member-employees to limited liability companies); *Metro Commc'n Corp. BVI, v. Advanced Mobilecomm Techs. Inc.,* 854 A.2d 121, 153–55 (Del.Ch.2004) (imputing fraud claims to corporation where it designated a manager of a limited liability company and where the manager made fraudulent statements); *Nolan v. E. Co.,* 241 A.2d 885, 891 (Del.Ch.1968) ("Knowledge of an agent acquired while acting within the scope of his authority is imputable to the principal."), *aff'd,* 249 A.2d 45 (Del. 1969); *see also* 3 William Meade Fletcher, *Fletcher Cyc. Corp.* § 790, at 16–20 (perm

---

4. *See In re Int'l Bus. Machs. Corporate Sec. Litig.,* 163 F.3d 102, 110 (2d Cir.1998) ("A duty to update may exist when a statement, reasonable at the time it is made, becomes misleading because of a subsequent event."); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997) ("[T]here may be room to read in an implicit representation by the company that it will update the public with news of any radical change in the company's plans" when it makes public disclosure.); *Stransky v. Cummins Engine Co., Inc.,* 51 F.3d 1329, 1331 (7th Cir.1995) ("The [duty to update] applies when a company makes a historical statement that, at the time made, the company believed to be true, but as revealed by subsequently discovered information actually was not. The company then must correct the prior statement within a reasonable time."); *Backman v. Polaroid Corp.,* 910 F.2d 10, 16–17 (1st Cir.1990) ("Obviously, if a disclosure is in fact misleading when made, and the speaker thereafter learns of this, there is a duty to correct it.").

ed., rev. vol.2011 & supp. 2013) ("[T]he general rule is well established that a corporation is charged with constructive knowledge ... of all material facts of which its officer or agent receives notice or acquires knowledge [of] while acting in the course of employment within the scope of his or her authority, even though the officer or agent does not in fact communicate the knowledge to the corporation." (footnote omitted)).

▮ Once the Cisco sale occurred and Trellis learned of it, the "no bluebird" representation became materially misleading, and Trellis therefore had a duty to speak. Instead, Trellis remained silent. For purposes of fraud, the decision to remain silent placed Trellis in the same position as if Trellis knowingly made a false representation in the first instance.

### 3. Inducement, Reliance, And Causation

▮ At this point, only Trellis is potentially liable for fraud and only in connection with the September 27, 2007 purchase. But for liability to exist, Trellis must have made its misrepresentation "with the intent to induce action or inaction by the plaintiff." *Stephenson*, 462 A.2d at 1074. "A result is intended if the actor either acts with the desire to cause it or acts believing that there is a substantial certainty that the result will follow from his conduct." Restatement of Torts § 531, cmt. c. The party that was the recipient of the information "must in fact have acted or not acted in justifiable reliance on the representation." *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 29 (Del.Ch.2009) (internal quotation marks omitted). And the fraudulent misrepresentation must actually cause harm. *Id.* at 32; Restatement of Torts § 548A. Each of these requirements is met.

▮ Broeker represented that he did not know of "any bluebirds of happiness in the Wayport world," JX 248, to induce Stewart to complete the sale transactions. At the time, Stewart was complaining about information asymmetry, and Broeker sought to mollify his concerns. Broeker intended for Stewart to rely on the statement, to no longer be suspicious about what Trellis knew, and to sell his shares. For his part, Stewart relied on Trellis's representation. Stewart was concerned about Trellis's insider knowledge, and Broeker's statement spoke directly to that issue. In response, Stewart emailed Broeker, saying that "[i]f you know of a Google deal in play, perhaps you ought to refrain from this transaction, or arrange for us to be on a level information playing field." JX 246. This email demonstrates that Stewart took Trellis's representation seriously and expected that if Trellis were aware of any unexpected good news, Trellis would either abstain from the transaction or disclose. After learning of the Cisco sale, Trellis did neither. Under the circumstances, Stewart's reliance on Trellis was justifiable. He knew that Broeker's partner, Long, was a member of the Board, and Stewart had spoken and emailed with Long about developments at the Company. Long received a copy of the Patent Strategy Memo and communicated extensively with Stewart about the Company's patent strategy. Stewart had reason to believe that Trellis would know if any unexpected good news was forthcoming.

Stewart also demonstrated causation. Trellis's representation and course of dealing caused Stewart to feel comfortable closing the transactions with Trellis. The defendants make much of the fact that, in their view, Stewart wanted liquidity and would have sold his shares to someone else, such as Millennium. I find that if Broeker had not made his representation,

Stewart would *not* have sold to Trellis and would have suspected that something was afoot at the Company. Having already sold a significant number of shares, Stewart would not have sold additional shares until after he had requested and received Wayport's year-end financial statements. At that point, he would have seen the note about the patent sale and demanded additional information. Once he obtained it, he would have considered it thoroughly and used it to recalibrate his sense of the Company's value.

All this would have taken considerable time. Williams rarely responded quickly to Stewart's informational requests, except on the one occasion when Stewart asked for information when Williams knew Greg Williams was reengaging with Cisco. Williams was particularly resistant to providing Stewart with any information about the Cisco sale, going so far as to force Stewart to file a books and records action. Assuming one of the defendants provided some form of disclosure to Stewart about the Cisco sale, it would have taken months and potentially a Section 220 lawsuit before Stewart could be satisfied that he had obtained the information he needed. To the extent Stewart decided at some point to explore another sale, the process would take additional months, as demonstrated by the lengthy timeline required for each of the transactions at issue in this case. I find that Stewart still would have been holding his shares approximately one year later when Wayport announced that it would be acquired by AT & T for $7.20 per share. Instead, because of the "no bluebirds" representation and Trellis's failure to correct it, Stewart sold 100,000 shares to Trellis on September 27, 2007 for $2.50 per share.

### 4. Scienter

■ The final hurdle for Stewart's common law fraud claim is *scienter*. Un-

der Delaware law, *scienter* can be proven by establishing that the defendant acted with knowledge of the falsity of a statement or with reckless indifference to its truth. *See Metro*, 854 A.2d at 143. Stewart proved that Trellis acted with *scienter* by establishing that Long knew of the Cisco transaction by July 2, 2007 (via Vucina's email) and received detailed information on July 20 (via the distribution of Board materials) and on July 25 (via Board meeting). On June 8, less than a month earlier, Long read Broeker's "no bluebirds" representation. Yet despite repeated communications from Wayport management about the importance of the Cisco sale, which demonstrated that the "no bluebirds" representation was false, Long remained silent.

■ It would have been evident to Long that if Trellis disclosed the Cisco sale to Stewart, the stock purchase would not have gone forward as planned. Long knew from personal experience that Stewart was a volatile and combative fellow. He also knew that Stewart was deeply interested in the Company's patents and its monetization efforts, having been copied on the Patent Strategy Memo which suggested selling the MSSID Patents to Cisco. If Long told Stewart about the Cisco sale, Stewart would have demanded information and wanted to analyze its implications, just as he ultimately did when he saw a reference to a patent sale in Wayport's financial statements. The process would be unpleasant, and Stewart could be expected to indulge his penchant for eloquent accusations. But if Long and Trellis failed to mention the sale, there was a good chance that Stewart might never find out—or find out too late for it to matter. Wayport and Cisco had agreed to keep the sale confidential, and during approximately the same period, Williams was

attempting to keep any mention of the sale out of the Company's financial statements. The evidence is circumstantial but sufficient to find that Long knew disclosure would place the stock sales at risk and therefore decided not to correct Trellis's earlier representation. *Scienter* is therefore met.

### 5. Damages for Fraud

■ "The recipient of a fraudulent misrepresentation is entitled to recover as damages ... pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation." Restatement of Torts § 549. The best measure of the quantum of Stewart's damages is approximately $470,000, or $4.70 per share, calculated as the difference between the $7.20 per share Stewart would have received in the AT & T merger and the $2.50 per share that Stewart received from Trellis in the final stock sale. I say "approximately $470,000" because to account for Stewart's use of the cash he received from Trellis, the parties will add interest to that amount at the legal rate, compounded quarterly, for the period from September 27, 2007 until December 11, 2008. *See Lynch v. Vickers Energy Corp.,* 429 A.2d 497, 506 (Del.1981). Trellis is liable to Stewart for the net amount, plus pre- and post-judgment interest at the legal rate, compounded quarterly, from December 11, 2008, until the date of payment.

## C. The Equitable Fraud Claim

In addition to their common law fraud claim, the plaintiffs asserted that the defendants are liable for "equitable" or "constructive" fraud. "Constructive fraud is simply a term applied to a great variety of transactions, having little resemblance either in form or nature, which equity regards as wrongful, to which it attributes the same or similar effects as those which

follow from actual fraud...." 3 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 922, at 626 (5th ed.1941).

■ The principal factor distinguishing constructive fraud from actual fraud is the existence of a special relationship between the plaintiff and the defendant, such as where the defendant is a fiduciary for the plaintiff. *See NACCO,* 997 A.2d at 33. On the facts of this case, the breach of fiduciary duty count confronts directly the implications of the fiduciary relationship, rendering the constructive fraud count redundant and superfluous. *See Parfi Hldg. AB v. Mirror Image Internet, Inc.,* 794 A.2d 1211, 1236–37 (Del.Ch.2001), *rev'd on other grounds,* 817 A.2d 149 (Del.2002).

Equitable fraud also has been described as a form of fraud having all of the elements of common law fraud except the requirement of *scienter. See Zirn v. VLI Corp.,* 681 A.2d 1050, 1061 (Del.1996) (explaining that equitable fraud "provides a remedy for negligent or innocent misrepresentations"); *Stephenson,* 462 A.2d at 1074 (noting that with equitable fraud, a "defendant [does] not have to know or believe that his statement was false or to have proceeded in reckless disregard of the truth"). To the extent this formulation is used, the outcome is no different. The plaintiffs failed on their common law fraud claims against NEA and Williams for reasons other than *scienter,* and hence their equitable fraud claims would fail as well. The plaintiffs succeeded on their common law fraud claim against Trellis.

## III. CONCLUSION

Trellis is liable to Stewart for damages in accordance with this opinion. Otherwise judgment is entered in favor of the defendants and against the plaintiffs. All parties will bear their own costs. The plaintiffs will submit a form of Final Order

and Judgment after consulting with the defendants as to form.