# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KENNETH E. CLARK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2017-0839-JTL |
| | ) | |
| CHESTER C. DAVENPORT, CECE | ) | |
| DAVENPORT BERKOWITZ, COREY | ) | |
| DAVENPORT, ROBERT L. REISLEY, | ) | |
| JONATHAN FOTOS, GEORGETOWN | ) | |
| BASHO INVESTORS, LLC, and ADAM J. | ) | |
| WRAY, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: May 2, 2019
Date Decided: July 18, 2019

Robert A. Penza, Christina M. Belitz, POLSINELLI PC, Wilmington, Delaware; *Attorneys for Plaintiff Kenneth E. Clark*.

Andrew D. Cordo, F. Troupe Mickler IV, Hayley M. Lenahan, ASHBY & GEDDES, P.A., Wilmington, Delaware; *Attorneys for Defendant Adam J. Wray*.

David A. Felice, BAILEY & GLASSER, LLP, Wilmington, Delaware; *Attorneys for Defendant Corey Davenport*.

**LASTER, V.C.**

The plaintiff sued seven defendants for inducing him to make three investments in a failed enterprise. Three of the defendants defaulted. Two settled. The remaining two moved to dismiss the complaint pursuant to Rule 12(b)(6) for failing to state a claim on which relief can be granted. One of the two remaining defendants moved for dismissal pursuant to Rule 12(b)(2), contending that this court lacks personal jurisdiction over him. The Rule 12(b)(6) motions are granted in part. The Rule 12(b)(2) motion is denied.

## I.       FACTUAL BACKGROUND

The facts are drawn from the amended complaint and the documents it incorporates by reference. At this stage of the proceeding, the complaint's allegations are assumed to be true, and the plaintiff receives the benefit of all reasonable inferences.

### A.       Basho And Georgetown

Founded in 2008, Basho Technologies, Inc. ("Basho" or the "Company") was a privately held Delaware corporation. Basho specialized in distributed-systems database software, which enables large companies to store and manage massive amounts of data using cloud-based applications. By late 2013, many large businesses, including over one third of the Fortune 50, were using Basho's software. According to industry analysts, Basho fell within a small cluster of companies best positioned to exploit this rapidly expanding market segment.

Along the way, Basho attracted the interest of defendant Chester Davenport, a wealthy and successful attorney. The defendants in this case include two other members of the Davenport family: Corey Davenport, Chester's son, and CeCe Davenport Berkowitz, Chester's daughter. For clarity, this decision refers to the Davenports by their first names.

Chester controlled non-party Georgetown Partners LLC and used it to make private-equity-style investments. Both Corey and CeCe are employees of Georgetown.

In February 2011, Georgetown invested in Basho through defendant Georgetown Basho Investors, LLC, a special purpose vehicle that Chester also controlled. For simplicity, this decision does not distinguish between Georgetown and the special purpose vehicle.

Georgetown purchased shares of Basho's Series D preferred stock and obtained the right to designate a member of Basho's board of directors (the "Board"). Georgetown designated Chester. In June 2012, Georgetown purchased shares of Basho's Series F preferred stock and received the right to designate a second member of the Board. Georgetown designated defendant Robert Reisley, an associate and confidante of Chester's who was a member and officer of Georgetown.

The Series F preferred stock carried blocking rights that prevented Basho from raising equity capital without the consent of holders of a majority of the Series F shares. As the holder of a majority of the Series F shares, Georgetown controlled the blocking rights.

## B. Chester Takes Control.

Chester wanted to force a near-term sale of Basho. He anticipated that Basho would soon need additional capital. He planned to use Georgetown's blocking rights to foreclose third-party financing options, thereby forcing Basho into a cash crisis. Basho eventually would turn to Georgetown, and Chester would insist on full control as the price for keeping Basho afloat. Once in control, Chester would achieve a near-term sale.

2

Consistent with this plan, Georgetown blocked Basho from pursuing attractive financing proposals from third parties. After failing to raise capital from other sources, Basho turned to Georgetown. Rather than investing equity, Georgetown provided Basho with a secured loan that authorized monthly draws of up to $1.5 million and a maximum credit limit of $7.5 million.

The loan was only a short-term financing solution, and Basho's management team expected to need more funding by the end of 2013. During 2013, Basho attempted to raise equity from outside investors, but Georgetown interfered with the process. Basho's CEO resigned in frustration.

Having cut off Basho's other financing options and with the loan coming due, Georgetown presented Basho with an offer to lead a Series G round that would raise a total of $25 million. Georgetown would fund $10 million, but only $2.5 million would be new money. The remaining $7.5 million would come from converting amounts due under the secured loan. Georgetown had not yet lined up any other investors to participate in the round. Georgetown wanted to close its part of the deal, then go into the market to find investors.

The terms of the Series G round were onerous. Among other things, the shares gave Georgetown control over 65% of Basho's voting power. Georgetown also would receive the right to designate four of seven directors. But without other options, Basho accepted.

The initial closing took place on January 23, 2014 (the "Series G Financing"). Immediately after closing, Georgetown added defendant Jonathan Fotos to the Board. He was a Georgetown employee and beholden to Chester. The Georgetown designees—

3

Chester, Reisley, and Fotos—then led the Board through a series of resolutions that the non-Georgetown directors had never seen before, much less discussed. One resolution appointed Chester as Executive Chairman. Another established an Executive Committee with the power to exercise all of the Board's authority. Its members were Chester, Reisley, and whoever became Basho's CEO. The Board approved all of the resolutions.

Effective March 10, 2014, Chester and Reisley hired defendant Adam Wray to serve as Basho's CEO. Wray also became a director and member of the Executive Committee. Although Wray had experience working at technology firms, including as a CEO, he was underqualified to lead Basho. Chester and Reisley nevertheless provided Wray with a lavish compensation package that was out of step with market terms.

After hiring Wray, the Executive Committee continued to manage Basho. The Board did not convene a formal meeting for months. During this period, numerous key personnel left the Company.

## C. Insider Transactions With Chester's Affiliates

Basho continued to need money. Davenport and his Georgetown colleagues thought they would be able to find investors to fill out the remaining $15 million for the Series G Financing, but they had little success. The punitive terms of the Series G Financing sparked concern, and every investor who had previously shown interest in Basho declined to participate. By mid-March 2014, Georgetown had managed to raise only $67,500 from other investors.

4

To keep Basho going, Georgetown exercised warrants it had received in the Series G Financing and paid $1.8 million for additional Series G shares. The date for exercising the warrants had passed, but the Executive Committee extended it for Georgetown.

Chester next paid an individual in China to refer investors to Basho. Those efforts led to additional purchases of Series G shares totaling $2.5 million.

Georgetown next engaged two investment banks to place the Series G shares. They failed to generate any interest.

After that, Chester resorted to funding Basho with insider loans. In April 2014, the Executive Committee approved a $650,000 loan from Georgetown. In June, the Executive Committee approved a loan of $1.5 million from Newport Beach Investors, LLC ("Newport"), another entity that Chester controlled. In August, the Executive Committee approved a second loan from Newport, this time in the amount of $250,000. In September, the Executive Committee approved a third loan from Newport, this time in the amount of $400,000.

Basho's difficulties in raising capital signaled to its business partners that it was distressed. As a result, Basho lost significant strategic relationships, including with companies such as Cluster Technologies, NEC, Xyratex Ltd., Seagate Technology LLC, EMC Corporation, and Akamai Technologies, Inc.

## D.     Clark's October 2014 Investment

In October 2014, Chester telephoned plaintiff Kenneth Clark about investing in Basho. Clark was the founder and chairman of First Guaranty Mortgage Company, a residential mortgage lender licensed in forty-four states. Clark had met Chester in 1988

5

when First Guaranty merged with a savings and loan association that Chester partly owned. Clark and Chester stayed in contact over the years, and Clark considered Chester a friend.

For his part, Chester knew that Clark was in the process of selling First Guaranty to a private equity firm, which meant Clark would have cash to deploy. Chester also knew that Clark was not a professional investor and did not have any particular knowledge about Basho or its industry.

During a call with Clark on October 2, 2014, Chester spoke positively about Basho. After the call, he sent Clark an email that attached an "Executive Summary." The email contained positive statements about Basho, the state of its business, and the market in which it operated. The email did not mention other highly material facts about the difficulties that Basho had encountered and the ongoing problems it faced.

For example, Chester told Clark, "We have not raised capital from the [*sic*] Venture Capital. Most of the capital has been raised By [*sic*] the insiders in the Company." Although technically true, Chester failed to mention that Basho had tried to raise money from venture capital funds and failed miserably, or that the money raised from insiders included repeated, emergency cash injections from Chester and his affiliates. By omitting the negative information, Chester implied that Basho had not yet sought venture capital due to the high level of participation by Basho's insiders and their confidence in Basho.

Chester also told Clark that as a result of the Series G Financing, Georgetown "became the controlling shareholder of the Company and has 5 of the 7 board seats." Chester conveyed this message as part of his pitch that there was "a new sheriff in town" who would take Basho to the next level. Chester's statement was deceptive because

6

Georgetown had been exercising control over Basho since *before* the Series G Financing, which would have undermined the "new sheriff in town" narrative.

Chester also represented in his October email: "We only have $8M of the G shares that remain to be sold. We are offering those shares first to family and friends of GTP's Limited Partners." This was deceptive. Georgetown was not offering the Series G shares first to friends and family. Chester contacted Clark only after exhausting his other options.

Chester even represented to Clark that Basho had "engaged Benchmark, a New York investment banking firm to sell $50M-$60M of new securities valuing Basho closer to the Values being given our competitors" and that he expected "the value of Basho will be set in a range of $500M to $600M." Benchmark never set a value for Basho in this range. Given Basho's condition at the time, Chester could not have reasonably expected that Basho would receive that valuation.

The complaint details other positive statements in Chester's email that were similarly misleading. In each case, Chester omitted closely related and highly material negative information that was necessary to put the positive statement in context.

The Executive Summary also contained false and misleading disclosures about Wray. For example, it stated that "Wray is a cloud enterprise technology entrepreneur and executive with more than 20 years of experience," but cloud technologies did not become a market segment until approximately 2009, and Wray had never been a cloud enterprise technology "entrepreneur."

Wray's bio also claimed that he had

7

led a variety of companies at different stages, holding positions of CEO, president, GM and product management. Most recently, Wray served as the CEO and president of Tier 3, where he led the company through nearly $20 million in funding from venture capitalists and grew the company from a startup to an eight figure annual run-rate ($10M+) before selling the company to CenturyLink for several hundred million dollars.

Elsewhere, the Executive Summary represented that Wray and Basho CTO Dave McCrory had "led VC-backed companies to successful M&A exits." These statements were false. Wray did not sell Tier 3 to CenturyLink. In fact, Wray admitted under oath in another proceeding that Tier 3 replaced him as CEO in October 2012 and that his successor accomplished the sale over a year later. Wray had not led any VC-backed companies to a successful M&A exit.

The complaint alleges that after speaking with Clark and sending this email, "Chester put Clark in contact with Wray." The complaint pleads a series of negative facts that Clark was not told. It then alleges that "Wray did not provide Clark with any of this material Basho history. On the contrary, Wray corroborated everything Chester had said, and reinforced the message that Basho was postured for imminent success."

Based on his communications with Chester and Wray, Clark decided to invest. In making his decision, Clark took into account his years of friendship with Chester and the fact that Chester had always seemed to act honestly. He trusted Chester and believed that he was receiving an inside view of Basho from the people who controlled it. Precisely because Chester controlled Basho, Clark thought Basho was an ideal opportunity for a passive investment, enabling him to focus on the sale of his mortgage-lending business.

8

On October 28, 2014, Clark invested $2 million in Basho in return for Series G shares (the "October 2014 Investment"). Clark documented the investment by executing a signature page to Basho's Series G Senior Participating Preferred Stock Purchase Agreement.

E.    **Clark's December 2014 Investment**

In December 2014, Chester again approached Clark and urged him to make an additional investment in Basho. Wray also communicated with Clark about the investment. Together, they claimed that (i) at least three investment funds were clamoring to fill out the Series G round but that Chester was stalling them to facilitate investments by friends like Clark, (ii) other investors in New York were considering the shares but Chester wanted Clark to buy them, (iii) an aggressive ramp-up of Basho's booking was expected for 2015, (iv) Basho was close to claiming the dominant position in its market by the end of 2015, and (v) Basho was on the verge of an enormously beneficial strategic partnership with IBM.

During these discussions, Wray represented to Clark that Basho expected to achieve $32 million in bookings for 2015. Wray also represented that Basho was uniquely positioned to achieve a strategic partnership with IBM because IBM owned The Weather Company, an existing Basho client. According to Wray, Basho expected to announce its strategic partnership with IBM on February 22, 2015, at the IBM Interconnect Conference.

Neither Chester nor Wray identified any of the serious problems that Basho faced. They did not disclose any of the negative information that they had failed to disclose in connection with the October 2014 Investment, nor did they disclose additional problematic

9

events that had taken place in the interim. Most notably, they never disclosed that an outside director and co-founder of Basho (Earl Galleher) had filed a complaint seeking books and records based on detailed allegations of serious fiduciary misconduct by Chester and Georgetown.

In reliance on Chester and Wray's sanitized representations, Clark invested another $500,000 in Basho. In exchange, he received additional Series G shares (the "December 2014 Investment").

## F. Clark's March 2016 Investment

Fifteen months passed between the December 2014 Investment and Clark's next investment. During the intervening period, Basho completed the Series G round. The final investment came from the Business Development Corporation of America ("BDCA"), which invested $2 million of equity and loaned Basho $10 million in March 2015. But even after the BDCA investment, Basho's financial condition continued to deteriorate. In June 2015, the outside director and co-founder who had filed the books-and-records action (Galleher) circulated a detailed memorandum expressing serious concerns about Basho and requesting immediate Board action. In October 2015, Galleher circulated another detailed memorandum raising additional concerns.

During this period, Clark did not receive any meaningful information about Basho's situation. His principal contacts were Chester and Wray, but they did not disclose the hardships Basho was facing, nor did they tell him about Galleher's claims. For his part, Clark did not pay significant attention to Basho, both because he trusted Chester, and

10

because he was still focused on selling his mortgage business. That transaction closed in October 2015.

From time to time, Clark did check in with Chester and Wray. For example, on February 17, 2016, Clark contacted Wray for an update. During their efforts to schedule a call, Wray cited a conflict because of meeting with Raytheon regarding a "large gov pursuit we've been chosen for." Clark responded that Raytheon sounded like "huge upside potential" and asked if "[e]verything [was] going well?" Wray wrote back:

> Yes, everything's going great. The position we've staked out in IoT and Time Series is really starting to take hold w/ IBM, Cisco and others, including Akamai, Juniper and Wind River.
>
> On the Raytheon pursuit, it will be huge. We've been chosen by their Solipsys division to be the standard going forward for their DB over Oracle. That means we're being baked into over 20 massive gov pursuits that they have w/ countries from US to Quatar [*sic*], plus becoming foundational to review existing clients for change out in next cycle. We should see some rather large upside this yr out of Raytheon, and growth to only continue from there (side note, their interest and review of our technology brought Lockheed Martin to the table to us as well, as they did a 6mo extensive review of the market and choose [*sic*] our distributed tech over everyone else).
>
> Exciting times for sure.

Wray did not mention that Basho was again desperate for capital. Nor did he mention Galleher's concerns.

Instead, Chester and Wray approached Clark to participate in Basho's Series H round. After further discussions, Clark agreed to invest a total of $6 million with Chester through a newly formed, special purpose vehicle named KEC Capital, LLC ("KECC"). The joint investment reinforced Clark's confidence in Basho, because he and Chester were investing the additional funds together.

11

KECC committed to make the $6 million investment based on a letter of intent sent to Basho on February 11, 2016 (the "Series H Letter of Intent"). It stated:

> We are interested in investing in Bash at a fully diluted total enterprise value of $45 million, which represents approximately 3x 2015 revenue of $14.97 million. We expect that KECC will invest at least $6.0 million of primary capital onto the balance sheet (inclusive of the conversion of $1.0 of certain outstanding indebtedness), and would have the right to invest an additional $4.0 million on the same terms within 60 days after the initial closing. This valuation is based upon information that has been provided to us to date, including among other things, historical financial results, and projections that indicate that Basho has a path to achieving sustained cash flow positive results within 12 months of the close of this transaction.

Wray countersigned on behalf of Basho.

The complaint alleges that the reference to "information that has been provided to us to date" included analyses prepared collectively by Reisley, Fotos, and Corey. Based on Fotos's testimony in another proceeding, the complaint alleges that at the time Wray countersigned the Series H Letter of Intent, Basho was "a company in collapse—a complete failure." The complaint alleges that the defendants, including Wray and Corey, could not have believed that "Basho ha[d] a path to achieving sustained cash flow positive results within 12 months of the close of" the Series H transaction.

The Series H Letter of Intent contemplated KECC conducting due diligence before closing. The record at this stage does not provide insight into what, if any, due diligence KECC conducted.

On March 15, 2015, the Series H round closed. KECC was credited with an investment of $6 million, comprising $5 million in cash plus $1 million of loan forgiveness from Georgetown (the "Series H Investment"). KECC borrowed the $5 million in cash

12

from a third-party lender. Clark and Chester provided personal guarantees for the debt, making them each jointly and severally liable for the full amount.

Completing the Series H transaction required filing a restated certificate of incorporation with the Secretary of State of Delaware that authorized the Series H preferred stock. After the Series H transaction closed, Clark joined the Board.

## G. Basho's Demise

In July 2016, Clark learned from a Board presentation that Basho's cash-burn rate was alarmingly high, that its bookings were lagging, and that Basho needed cash desperately. Having just made the Series H Investment based on projections which showed that Basho would be cash-flow positive in twelve months without the need for any additional cash, Clark demanded an explanation. Chester told Clark to "ask Adam."

In August 2016, Clark learned from Basho's CFO that Chester had been advancing funds to meet Basho's working capital needs, that a further advance was needed to make payroll, and that Basho had obtained an emergency loan of $900,000 from BDCA. Soon afterwards, Clark learned that Basho was in default under the terms of its loan with BDCA and had been discussing bankruptcy as an option.

In September 2016, Clark learned that Basho was seeking another emergency loan from BDCA to cover its cash needs for 60–90 days while it sought to sell the business. BDCA extended the loan, but no buyer was found. In November, BDCA issued a formal notice of default.

In December 2016, Wray reported to Basho's directors that BDCA had recommended that Basho file for bankruptcy. He also told the directors that BDCA thought Clark was the only likely source of funds to enable Basho to make payroll.

Faced with the loss of his entire investment, Clark loaned Basho $500,000 so it could explore an emergency sale (the "December 2016 Loan"). To facilitate a sale, Clark obtained the right to vote Georgetown's shares and took over from Chester as Executive Chairman. After no transaction materialized, Clark surrendered his right to vote Georgetown's shares and resigned as Executive Chairman.

In July 2017, BDCA obtained an order from a court in the State of Washington that placed Basho into receivership. Basho had ceased to be a going concern, and its equity was worthless. As part of the liquidation, the receiver sold any claims that Basho might have possessed against the defendants to entities affiliated with Galleher.

## H.     Clark Brings This Litigation.

Clark filed this action on November 21, 2017. Believing that Chester had defrauded him with the assistance of other individuals who worked for Chester at Georgetown and Basho, Clark sued Chester, Corey, CeCe, Reisley, Fotos, and Wray. He also sued Georgetown.

In Count I of the complaint, Clark asserted claims for breach of fiduciary duty against Georgetown, Chester, Reisley, Fotos, and Wray in connection with the December 2014 Investment and the Series H Investment. When each challenged transaction took place, Chester, Reisley, Fotos, and Wray were directors of Basho, Wray was its senior-most officer, and Georgetown was its controlling stockholder.

14

In Count II of the complaint, Clark asserted claims for common law fraud against Georgetown, Chester, Reisley, Fotos, Wray, CeCe, and Corey. He contended that the defendants defrauded him in connection with the October 2014 Investment, the December 2014 Investment, and the Series H Investment.

In Count III of the complaint, Clark asserted claims for negligent misrepresentation against Georgetown, Chester, Reisley, Fotos, Wray, CeCe, and Corey. He contended that the defendants misled him in connection with the October 2014 Investment, the December 2014 Investment, and the Series H Investment.

In Count IV of the complaint, Clark asserted claims for aiding and abetting against Reisley, Fotos, Wray, CeCe, and Corey. He contended that they knowingly participated in the underlying torts asserted in Counts I, II, and III and, if not primarily liable, should be secondarily liable.

Clark's complaint thus focused on the October 2014 Investment, the December 2014 Investment, and the Series H Investment. The complaint referenced the December 2016 Loan in each of the counts, but Clark clarified that he only included that transaction as a source of additional damages, not as an independent instance of wrongdoing.

Chester, CeCe, and Georgetown failed to respond to the complaint. Default judgments were entered against them. Clark reached settlements with Fotos and Reisley, and the claims against them were dismissed.

## I. The Motions To Dismiss

The two remaining defendants—Wray and Corey—moved to dismiss the complaint. Both contended that the complaint fails to state a claim on which relief can be granted.

15

Corey additionally contended that this court cannot exercise jurisdiction over his person for purposes of the claims asserted in the complaint.

Ordinarily, a court must address issues of personal jurisdiction before considering claims on their merits. In this case, however, Clark asserts that jurisdiction over Corey exists under the conspiracy theory of jurisdiction. Evaluating this theory requires assessing whether the complaint sufficiently pleads that Corey conspired to engage in tortious activity that had a sufficient connection to the State of Delaware to support jurisdiction over his person. It therefore makes sense to evaluate the claims first, because the viability of the claims is an input in the jurisdictional analysis.

## II.     THE RULE 12(b)(6) MOTION

Wray and Corey have moved to dismiss the complaint pursuant to Rule 12(b)(6). When considering this type of motion, the court (i) accepts as true all well-pleaded factual allegations in the complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the plaintiff. *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002). When applying this standard, "dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof." *Id.* at 897 (internal quotation marks omitted).

## A.     Count I: Breach Of Fiduciary Duty

In Count I of the complaint, Clark asserted claims for breach of fiduciary duty in connection with the December 2014 Investment and the Series H Investment. He did not advance this theory as to the October 2014 Investment, because until that investment

16

closed, he was not yet a stockholder and was not yet owed fiduciary duties. Wray is the only remaining defendant for Count I.

A claim for breach of fiduciary duty has only two formal elements: (i) the existence of a fiduciary duty and (ii) a breach of that duty.[1] For the first element, the complaint easily clears the bar. When the events in question took place, Wray was a director and officer of Basho and owed fiduciary duties to Basho and its stockholders in that capacity.

The second element is more complicated. Clark has made clear that he is not asserting claims for breach of fiduciary duty based on how Wray and his fellow fiduciaries managed Basho. Instead, Count I asserts that the defendants breached their duties by failing to disclose information to him when soliciting the December 2014 Investment and the Series H Investment.

Directors of a Delaware corporation owe two fiduciary duties: care and loyalty. *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006). The "duty of disclosure is not an independent duty, but derives from the duties of care and loyalty." *Pfeiffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009). The duty of disclosure arises because of "the application in a specific context of the board's fiduciary duties . . . ." *Malpiede v. Townson*, 780 A.2d 1075, 1086 (Del. 2001). Its scope and requirements depend on context; the duty "does not exist in a vacuum." *Stroud v. Grace*, 606 A.2d 75, 85 (Del. 1992). "When confronting a

---

[1] *See Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010); *accord Zrii, LLC v. Wellness Acq. Gp., Inc.*, 2009 WL 2998169, at *11 (Del. Ch. Sept. 21, 2009) (citing *Heller v. Kiernan*, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002)).

disclosure claim, a court therefore must engage in a contextual[ly] specific analysis to determine the source of the duty, its requirements, and any remedies for breach." *In re Wayport, Inc. Litig.*, 76 A.3d 296, 314 (Del. Ch. 2013) (citing Lawrence A. Hamermesh, *Calling Off the Lynch Mob: The Corporate Director's Fiduciary Disclosure Duty*, 49 Vand. L. Rev. 1087, 1099 (1996)).

Governing principles have been developed for commonly recurring scenarios, such as when directors request stockholder action. A less common scenario involves a corporate fiduciary who buys shares directly from or sells shares directly to a stockholder in a private transaction. *See* Hamermesh, *supra*, at 1103. In this setting, the special facts doctrine applies, and the fiduciary has a duty to disclose information to the stockholder counterparty "only when a director is possessed of special knowledge of future plans or secret resources and deliberately misleads a stockholder who is ignorant of them." *Lank v. Steiner*, 224 A.2d 242, 244 (Del. 1966). If this standard is met, a duty to speak exists, and the director can be held liable for failing to disclose material information. If this standard is not met, then the director does not have a duty to speak and is liable only to the same degree as a non-fiduciary would be. *See Wayport*, 76 A.3d at 315.

It seems logical that once Clark had become a stockholder, then the private transactions between Clark and Basho, which Chester and Wray facilitated, would implicate the special facts doctrine. But neither side relied on this framework. In his opening brief, Wray argued that the fiduciary-duty claim should be governed by the framework announced in *Malone v. Brincat*, 722 A.2d 5 (Del. 1998). In his opposition, Clark effectively agreed by articulating the governing principles as framed in *Malone*.

18

The *Malone* framework applies when a corporate fiduciary speaks outside of the context of soliciting or recommending stockholder action, such as through "public statements made to the market," "statements informing shareholders about the affairs of the corporation," or public filings required by the federal securities laws. *Malone*, 722 A.2d at 11. In that context, directors owe a duty to stockholders not to speak falsely:

> Whenever directors communicate publicly or directly with shareholders about the corporation's affairs, with or without a request for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith and loyalty. It follows *a fortiori* that when directors communicate publicly *or directly with shareholders* about corporate matters the *sine qua non* of directors' fiduciary duty to shareholders is honesty.

*Id.* at 10 (emphasis added). "[D]irectors who knowingly disseminate false information that results in corporate injury *or damage to an individual stockholder* violate their fiduciary duty, and may be held accountable in a manner appropriate to the circumstances." *Id.* at 9 (emphasis added). "When the directors are not seeking shareholder action, but are deliberately misinforming shareholders about the business of the corporation, *either directly or by a public statement*, there is a violation of fiduciary duty." *Id.* at 14 (emphasis added). Breach "may result in a derivative claim on behalf of the corporation[,]" "a cause of action for damages[,]" or "equitable relief . . . ." *Id.*

This court has characterized the standard for evaluating a claim under *Malone* as "similar to, but even more stringent than, the level of scienter required for common law fraud." *Metro Commc'n Corp. BVI v. Advanced MobileComm Techs. Inc.*, 854 A.2d 121, 158 (Del. Ch. 2004). For a common law fraud claim, a plaintiff can show reckless indifference, but *Malone* requires knowing misconduct. *Id.* at 158 n.88. Like common law

19

fraud, a *Malone* claim requires "reasonable reliance." *Id.* at 157–58. This court has interpreted the Delaware Supreme Court as "set[ting] a high bar for *Malone*-type claims . . . to ensure that our law was not discordant with federal standards and that our law did not encourage a proliferation of disclosure claims outside the discretionary vote or tender context by exposing directors to an additional host of disclosure claims . . . ." *Id.* at 158 (footnote omitted). Similar policy concerns do not exist for scenarios covered by the special facts doctrine, where a fiduciary purchases or sells shares (or facilitates the purchase or sale) in a direct transaction with a stockholder beneficiary. But to reiterate, Clark does not view this as anything other than a *Malone* case, so that is the law that this decision applies.

Other than contending that *Malone* provides the governing framework, Wray does not make any arguments that are specifically directed at Count I. He is content to treat his exposure under *Malone* as coextensive with his exposure for common law fraud, and he saves his firepower for that count. Clark followed Wray's lead by accepting the *Malone* framework and not treating the claim for breach of fiduciary duty as subject to different procedural or substantive rules.

This decision accepts the parties' framework for purposes of this case and treats the claims for breach of fiduciary duty as rising or falling with the claims for common law fraud in Count II. To the extent Count II states a claim based on either the December 2014 Investment or the Series H Investment, which are the only transactions challenged in Count I, then Count I also states a claim as to those transactions.

**B. Count II: Common Law Fraud**

In Count II of the complaint, Clark asserted claims for common law fraud based on the October 2014 Investment, the December 2014 Investment, and the Series H Investment. To plead a claim for fraud under Delaware law, a plaintiff must allege (i) a false statement, generally of fact, (ii) the defendant's knowledge or belief of its falsity or reckless indifference to its truth, (iii) the defendant's intention to induce action, (iv) reasonable reliance, and (v) causally related damages. *See Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).

Particular aspects of a fraud claim must be pled "with particularity." Ct. Ch. R. 9(b). This means a plaintiff must allege "the circumstances of the fraud with detail sufficient to apprise the defendant of the basis for the claim." *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006). The relevant circumstances are "the time, place, and contents of the false representations; the facts misrepresented; the identity of the person(s) making the misrepresentation; and what that person(s) gained from making the misrepresentation." *Trenwick Am. Litig. Tr. v. Ernst & Young LLP*, 906 A.2d 168, 207–08 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 2007 WL 2317768 (Del. Apr. 14, 2007) (ORDER). A defendant's state of mind, including the elements of knowledge and intent, "may be averred generally." *Anglo Am. Sec. Fund, L.P. v. S.R. Glob. Int'l Fund, L.P.*, 829 A.2d 143, 158 (Del. Ch. 2003). The same pleading standard applies when a plaintiff attempts to plead a fraud claim based on material omissions. *TransDigm Inc. v. Alcoa Glob. Fasteners, Inc.*, 2013 WL 2326881, at *6 (Del. Ch. May 29, 2013).

21

### 1. The Anti-Reliance Argument

As a threshold matter, Corey argues that Clark cannot assert any claims for fraud because the agreements that governed his investments contained anti-reliance provisions. They did not.

"[M]urky integration clauses, or standard integration clauses without explicit anti-reliance representations, will not relieve a party of its oral and extra-contractual fraudulent representations." *Abry P'rs*, 891 A.2d at 1059. For an anti-reliance defense to succeed, the contract "must contain language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract." *Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. 2004).

Corey cites two contractual provisions. One recites that the representations and warranties made in "Section 3" or "the Disclosure Schedule" will not be affected by any investigation by the purchasers. This is not an anti-reliance provision that protects the seller. It is a pro-sandbagging provision that protects the buyer. *See Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *76–78 (Del. Ch.) (discussing sandbagging), *aff'd*, 2018 WL 6427137 (Del. Dec. 7, 2018) (ORDER).

The other provision is a standard integration clause, which states that the agreement "constitutes the entire agreement and understanding of the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter." That is not an anti-reliance provision either. *See Prairie Capital III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 50 (Del. Ch. 2015).

22

## 2. Fraud In Connection With The October 2014 Investment

The first transaction at issue in Count II is the October 2014 Investment. As to this transaction, Count II fails to state a claim against Corey or Wray.

The complaint contains detailed allegations about what Chester told Clark in connection with the October 2014 Investment, both in a telephone call and in a subsequent email. The complaint does not provide similar detail about any communications from Corey or Wray.

As to Corey, the complaint says nothing. It does not indicate that he communicated with Clark in any way in connection with the October 2014 Investment.

As to Wray, the complaint alleges only that "Chester put Clark in contact with Wray." After pleading a series of negative facts about Basho, the complaint alleges that "Wray did not provide Clark with any of this material Basho history On the contrary, Wray corroborated everything Chester had said, and reinforced the message that Basho was postured for imminent success." In a subsequent paragraph, the complaint alleges that Wray understood that Clark was interested in making a passive investment and "affirmatively reinforced the suitability of this approach."

In *Metro Communication*, this court held that a similarly framed allegation did not satisfy the particularized pleading requirements of Rule 9(b). The plaintiff (Metro) alleged that the managers of an LLC (Fidelity Brazil) had concealed the fact that representatives of the LLC had paid bribes to government officials. The complaint alleged that after Metro received a letter "regarding 'activities of concern' . . . that had been investigated, Metro 'was assured by various representatives of [Fidelity Brazil], its members and managers that

23

there was no cause for concern and that [Fidelity Brazil's] business was continuing to develop according to plans.'" 854 A.2d at 144 (alterations in original). This court held that "[a]mong other deficiencies, this particular allegation does not even purport to identify any specific statement by a specific defendant at a specific time." *Id.* Although Clark's allegations at least name Wray, they are otherwise equally conclusory.

The fraud claim against Corey and Wray based on the October 2014 Investment is dismissed. Because this claim fails on the merits, this decision does not reach any of Corey or Wray's other grounds for dismissing this aspect of Count II.

### 3. Fraud In Connection With The December 2014 Investment

The second transaction at issue in Count II is the December 2014 Investment. As to this transaction, the complaint fails to state a claim against Corey but does so against Wray.

As to Corey, the complaint again says nothing. It does not indicate that he communicated with Clark in any way in connection with the December 2014 Investment.

As to Wray, the outcome is different. Wray made representations to Clark that fell into three categories. The first consisted of factual claims about Basho's fundraising efforts. Wray told Clark that (i) at least three investment funds were clamoring to fill out the Series G round but that Chester was stalling them to facilitate investments by friends like Clark and (ii) other investors in New York were considering the shares but Chester wanted Clark to buy them.

The second category consisted of factual claims about Basho's future prospects. Wray told Clark that (i) an aggressive ramp-up of Basho's booking was expected for 2015,

(ii) Basho was close to claiming the dominant position in its market by the end of 2015, and (iii) Basho expected to achieve $32 million in bookings for 2015.

The third category concerned a strategic partnership with IBM. Wray represented to Clark that Basho was on the verge of an enormously beneficial strategic partnership with IBM. He explained that Basho was uniquely positioned to achieve a strategic partnership with IBM because IBM owned The Weather Company, an existing Basho client. He also reported that Basho expected to announce its strategic partnership with IBM on February 22, 2015, at the IBM Interconnect Conference.

Wray argues that these statements were non-actionable opinions about future events. The statements about the fundraising process and the IBM partnership, however, were not about the future. These representations described the current state of Basho's relationships with its investors and with IBM. Wray's argument does not apply to these categories.

The statements about Basho's future prospects were forward-looking, but that did not mean Wray could say anything he wanted. So long as a party acts in good faith, errors in estimates or mistaken predictions about future success will not be sufficient to support a fraud claim. *In re Genesis Health Ventures, Inc.*, 355 B.R. 438, 458 (Bankr. D. Del. 2006). "On the other hand, when a party makes false statements with an intent to deceive, that party may be liable for fraud regardless of whether the statements expressed opinions, estimates, or projections of the future." *Id.* Wray's conduct supports an inference that he intended to deceive Clark, rendering his statements actionable at the pleading stage.

Wray also claims that his statements about Basho's prospects were non-actionable puffery. "Puffery is a 'vague statement' boosting the appeal of a service or product that,

because of its vagueness and unreliability, is immunized from regulation." David A. Hoffman, *The Best Puffery Article Ever*, 91 Iowa L. Rev. 1395, 1397 (2006). Under Delaware law, a person's optimistic statements about his "skills, experience, and resources" are "mere puffery and cannot form the basis for a fraud claim." *Solow v. Aspect Res., LLC*, 2004 WL 2694916, at *3 (Del. Ch. Oct. 19, 2004). Wray's statement that Basho was uniquely positioned to achieve a strategic partnership with IBM was puffery. The representations that IBM owned The Weather Company and that it was an existing Basho client were statements of fact. Wray's statements about the state of Basho's negotiations with IBM and an existing plan to announce the partnership on February 22, 2015, were also statements of fact.

Wray next contends that he cannot be liable for fraud because he did not participate in the transaction personally and had nothing to gain from Clark's investment. According to Wray, an allegation that an officer was motivated to deceive a plaintiff about a transaction with the company because of his position with the company is insufficient to support personal liability for fraud. For this proposition Wray relies on two federal cases: *GSC Partners CDO Fund v. Washington*, 368 F.3d 228 (3d Cir. 2004), and *Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001). Both cases concerned what a plaintiff needed to plead to support the "strong inference of fraudulent intent" required by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). *See GSC P'rs*, 368 F.3d at 237–38; *Kalnit*, 264 F.3d at 138–39. Both cases recognized that for purposes of establishing a claim for securities fraud, a plaintiff could not simply find a past disclosure that turned out to be inaccurate, combine it with a drop in the stock price, and then include a generalized

26

allegation about management's desire for the corporation to appear profitable or for the stock price to remain high. *See GSC P'rs*, 368 F.3d at 237–38; *Kalnit*, 264 F.3d at 138–39. For purposes of a disclosure claim under the PSLRA, allegations of this type about incentives that are "common to all corporate executives" are "too generalized to demonstrate scienter." *Kalnit*, 264 F.3d at 139. But the *Kalnit* court recognized that a plaintiff could plead scienter by identifying specific conduct by the executives in question, such as sales of shares. *See id.* at 141–42.

This is not a securities fraud case governed by the PSLRA, and Clark need not plead specific facts supporting a strong inference of scienter. Clark can plead knowledge and intent generally. *See* Ct. Ch. R. 9(b) ("Malice, intent, knowledge and other condition of mind of a person may be averred generally."). Equally important, this is not a case in which a plaintiff is alleging that an executive made false disclosures in public filings because he generally wanted to keep the stock price high. The complaint alleges that Basho faced a financial crisis, that Chester and Wray had exhausted other options, and that they desperately needed to obtain a cash infusion from Clark. As the CEO, Wray had a significant financial and reputational stake in keeping Basho solvent. Basho was his sole source of income, and he stood to gain personally and professionally by keeping the lights on. For a common law fraud claim, the complaint pleads facts sufficient to support an inference of scienter. The complaint states a claim for fraud against Wray in connection with the December 2014 Investment.

## 4.     Fraud In Connection With The Series H Investment

The third transaction at issue in Count II is the Series H Investment. Once again, the complaint does not state a claim against Corey, but states a claim against Wray.

As to Corey, the complaint alleges that Clark agreed to make the Series H Investment based on representations made and conditions set forth in the Series H Letter of Intent. That letter recited that Clark was investing based on a "total enterprise value of $45 million," which was "based upon information that has been provided to us to date, including among other things, historical financial results, and projections that indicate that Basho has a path to achieving sustained cash flow positive results within 12 months of the close of this transaction." The complaint alleges that Fotos, Reisley, and Corey prepared the "information . . . provided . . . to date," including the projections that showed "a path to achieving sustained cash flow positive results within 12 months of the close of this transaction." Fotos testified in another proceeding that at this point, Basho was "a company in collapse—a complete failure." That testimony supports a reasonable inference Corey could not have believed that Basho had a total enterprise value of $45 million or prepared reasonable projections that would show Basho achieving cash-flow-positive results within twelve months.

As with the other aspects of the fraud claim, the complaint does not allege that Corey made any statements directly to Clark. But that omission should not matter in this instance, where the complaint supports a reasonable inference that Corey and the other Georgetown representatives prepared the projections and other documents intending for them to be provided to Clark. A party that is not the speaker can be held liable for a false statement

28

"if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction . . . ." Restatement (Second) of Torts § 533 (Am. Law Inst. 1977). "If the misrepresentation is made for the purpose of having it communicated, the maker is subject to liability." *Id.* cmt. d. For example, "one who, to aid a friend in selling his land, gives him for transmission to a prospective purchaser a fraudulent misrepresentation as to the quantity or quality of the land, is subject to liability to the purchaser under the rule stated in this Section." *Id.* That scenario would seem to apply, supporting a claim against Corey. But Clark has not articulated this theory, so this decision does not adopt it. Clark has not argued another theory by which Corey could be held liable, so the complaint fails once again to state a claim against Corey.

By contrast, the complaint states a claim for fraud against Wray. For one thing, Wray signed the Series H Letter of Intent. Although different inferences can be drawn from that fact, one reasonable inference is that Wray agreed with the valuation and validated the view expressed in the letter that "Basho has a path to achieving sustained cash flow positive results within 12 months of the close of this transaction." The facts alleged in the complaint support a reasonable inference that the valuation and the statement about the existence of a path to sustained cash-flow-positive results were false.

The complaint further alleges that on February 17, 2016, shortly after the Series H Letter of Intent and before the Series H Investment closed, Clark contacted Wray to obtain an update about the Company. Wray informed Clark that Basho had "been chosen for" a

29

large government pursuit involving Raytheon and that based on Basho's selection, its technology was being "baked into over 20 massive [government] pursuits" in the United States and in foreign countries, including Qatar. In reality, Basho's business was failing and it was desperate for capital. Some of Wray's language was puffery, but the statements that Basho had been chosen for a valuable venture with Raytheon and that its technology was being incorporated in government pursuits were factual representations.

Wray claims yet again that the complaint does not identify the fraud with particularity, but in this case it does by citing the Series H Letter of Intent and Wray's February 2016 email. Wray again argues that he cannot be liable for fraud if he only stood to gain because of his status as the CEO of Basho, but this decision has rejected that argument as overly broad.

There is one final wrinkle presented by the claim involving the Series H Investment: Clark invested through KECC, rather than personally. According to the defendants, Clark therefore lacks standing to sue for fraud because KECC made the investment and suffered the injury. Perhaps KECC could sue, say the defendants, but not Clark.

KECC was a special purpose entity formed for Clark to make the Series H Investment jointly with Chester. The joint investment vehicle made Clark feel more comfortable because he perceived Chester to be investing alongside him, and it therefore can be regarded as part of the fraud. Clark personally secured and guaranteed the $5 million loan used to fund 83% of the value of the investment and 100% of the new money. Clark agreed to invest through KECC based on the misrepresentations and omissions cited in the complaint. In Count II, Clark is suing to recover the losses that he personally suffered from

30

forming KECC with Chester, obtaining and personally guaranteeing a loan for $5 million, and investing the proceeds in Basho through KECC. Based on these allegations, Clark has standing to bring a direct action against the individuals who fraudulently induced him to suffer these losses. Indeed, it is reasonably inferable at this stage that the creation of KECC and the joint investment through that entity were part of the scheme that led to Clark's losses.

The complaint states a claim for fraud against Wray in connection with the December 2014 Investment and the Series H Investment. Otherwise, Count II is dismissed.

## C. Count III: Negligent Misrepresentation

In Count III of the complaint, Clark advances a claim for negligent misrepresentation in connection with the October 2014 Investment, the December 2014 Investment, and the Series H Investment. This count fails to state a claim on which relief can be granted.

"[A]n equitable fraud or negligent misrepresentation claim lies only if there is either: (i) a special relationship between the parties over which equity takes jurisdiction (like a fiduciary relationship) or (ii) justification for a remedy that only equity can afford." *Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *9 (Del. Ch. Jan. 30, 2015). When the special relationship involves allegations of fiduciary breach, then the claim for equitable fraud is subsumed in the claim for breach of fiduciary duty. The latter claim "confronts directly the implications of the fiduciary relationship, rendering [a claim for equitable] fraud . . . redundant and superfluous." *Wayport*, 76 A.3d at 327.

To the extent that Clark's claim for negligent misrepresentation addresses the December 2014 Investment and the Series H Investment, it fails as a matter of law. For each of these claims, Clark has asserted a claim for breach of fiduciary duty, which is the proper claim. Moreover, the claim for breach of fiduciary duty in this case invokes the duty of disclosure as described in *Malone*, and this court has held that when *Malone* provides the framework for a claim for breach of fiduciary duty, it displaces any claim for negligent misrepresentation. *Metro Commc'n*, 854 A.2d at 130–31, 163.

This analysis does not apply to the October 2014 Investment, where Clark does not assert a claim under *Malone* because he was not yet a stockholder. For this claim, he argues that he can sue Wray for negligent misrepresentation because Wray and Chester positioned themselves as Clark's primary conduits for information and exploited Clark's relationship of "trust" and "friendship" with Chester.

Clark has not cited any cases that have grounded a negligent-misrepresentation claim on allegations about friendship. Perhaps some set of facts might exist, but they would require specific pleading to articulate why the friendship reached a level of trust and confidence analogous to a familial or a fiduciary relationship, rather than "mere personal friendship." *See, e.g.*, *Beam v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004) ("Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence."). If "mere personal friendship" is insufficient to undermine the independence of an actual fiduciary, it would likewise seem insufficient to convert an arm's-length relationship into something akin to a fiduciary one. In this case, Clark would need to bridge an additional conceptual

32

gap by bringing Wray within the scope of the friendship. The complaint in this case alleges only that Chester and Clark had an amicable professional acquaintance. The allegations describe "mere personal friendship" that would not support a claim for negligent misrepresentation against Chester, much less Wray.

## D.    Count IV: Aiding And Abetting

Count IV of the complaint asserts a claim for aiding and abetting the wrongdoing asserted in Counts I, II, and III of complaint. Importantly, the primary actors who allegedly engaged in wrongdoing in the other counts include Chester, who is the principal wrongdoer identified in the complaint. The operative question for Count IV is generally whether it is reasonably conceivable that Wray or Corey aided and abetted wrongdoing by Chester.

Because of how the parties have approached Counts I, II, and III, Count II's fraud claim is the only primary claim requiring analysis. The elements of a claim for aiding and abetting fraud are (i) an act of fraud by the primary actor, (ii) the secondary actor's knowledge of the primary actor's conduct, (iii) substantial encouragement or assistance from the secondary actor, and (iv) causally related damages. *See Prairie Capital*, 132 A.3d at 63–64; *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at *22–23 (Del. Ch. Nov. 26, 2014). Claims for aiding and abetting are "fact intensive and ill-suited" for disposition on the pleadings. *In re Good Tech. Corp. S'holder Litig.*, 2017 WL 2537347, at *2 (Del. Ch. May 12, 2017) (ORDER).

33

## 1. The October 2014 Investment

The complaint states a claim for fraud against Chester in connection with the October 2014 Investment. The operative question is whether the complaint sufficiently pleads that Wray or Corey aided and abetted Chester's fraud.

The complaint does not plead facts to support an inference that Corey knowingly participated in Chester's fraud or conspired with Chester for purposes of the October 2014 Investment. The complaint tries to paint a picture of Corey working behind the scenes to support Chester, and it cites an email that Corey sent to Chester, but its limited allegations do not make it reasonably conceivable that Corey knowingly participated in the fraud.

By contrast, the complaint supports a reasonable inference that Wray knowingly participated in Chester's fraud. The representations that Chester made to Clark included false information about Wray's background and experience. It is reasonably conceivable that Wray provided the false information to Chester. It is also critical to remember when assessing Wray's alleged involvement that he was the CEO and senior executive of the Company who reported directly to Chester and served together with Chester and Reisley as part of the three-man Executive Committee that ran the Company. For purposes of Chester's efforts to raise money from Clark, Wray was as connected to Chester as anyone could be. Count IV therefore states a claim against Wray for aiding and abetting Chester's fraud in connection with the October 2014 Investment.

Wray contends that laches should bar Clark from asserting any claims involving the October 2014 Investment. "[A]ffirmative defenses, such as laches, are not ordinarily well-

suited for treatment on [a motion to dismiss]" unless "the complaint itself alleges facts showing that [it was] filed too late."[2]

Clark filed his lawsuit on November 21, 2017, three years and a few weeks after the October 2014 Investment closed. Ordinarily, the three-year statute of limitations would bar the aiding-and-abetting claim. *See Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 983 (Del. Ch. 2016). Fraudulent concealment, however, will toll the statute of limitations. *Primedia*, 2013 WL 6797114, at *12.

In this case, the complaint supports a reasonable inference that Clark was the victim of an ongoing campaign of fraud that began with the October 2014 Investment and continued thereafter. As a result, Clark did not learn of facts sufficient to put him on inquiry notice until July 2016, after he joined the Board and received presentations about the true state of affairs at Basho. The fraudulent statements that Chester and Wray made to Clark in connection with the December 2014 Investment and the Series H Investment were sufficient to lead Clark away from the truth, providing a basis for tolling. *See In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 585, 590 (Del. Ch. 2007). It is reasonably conceivable that Clark's claim against Wray for aiding and abetting fraud in connection with the October 2014 Investment is timely. Because the complaint's

---

[2] *In re Primedia, Inc. S'holders Litig.*, 2013 WL 6797114, at *12 (Del. Ch. Dec. 20, 2013) (first alteration in original) (first quoting *Reid v. Spazio*, 970 A.2d 176, 183 (Del. 2009); then quoting *Kahn v. Seaboard Corp.*, 625 A.2d 269, 277 (Del. Ch. 1993)).

allegations support a reasonable inference of timeliness, the limitations defense is not suitable for pleading-stage disposition.

Corey's motion to dismiss Count IV is granted as to the October 2014 Investment. Wray's motion is denied.

### 2. The December 2014 Investment

The complaint states claims for fraud against both Chester and Wray in connection with the December 2014 Investment. The operative question is whether the complaint sufficiently pleads that Corey aided and abetted their fraud. Once again, the complaint does not plead any facts to support an inference that Corey was involved in any way with the December 2014 Investment. Corey's motion to dismiss Count IV is granted as to the December 2014 Investment.

This decision has held that Count II states a claim against Wray for purposes of the December 2014 Investment, but the claim for secondary liability potentially has independent significance. The complaint's allegations regarding the December 2014 Investment support a reasonable inference that Chester and Wray agreed to work together to induce Clark to invest as part of a common scheme. The complaint's allegations regarding the December 2014 Investment also support a reasonable inference that Wray spoke with Clark as a form of knowing participation in Chester's fraud. Count IV states a claim against Wray.

### 3. The Series H Investment

The complaint states claims for fraud against Chester and Wray in connection with the Series H Investment. The operative question is whether the complaint sufficiently pleads that Corey aided and abetted their fraud.

For purposes of aiding and abetting, the complaint supports a reasonable inference that Corey knowingly gave substantial assistance to Chester and Wray by preparing the financial statements and projections that supported an enterprise value for Basho of $45 million and the representation that Basho had a path to sustained cash-flow-positive results within twelve months after the closing of the Series H Investment. The complaint's allegation about Corey's involvement in the preparation of these materials is bolstered by Corey's public representations that he

- oversaw Basho's management;

- participated in recruiting, selecting, and evaluating Basho's executive personnel, including Basho's CEO (Wray), CFO, and CTO;

- played an instrumental role in devising Basho's corporate strategy;

- monitored management's progress in executing the overall strategy;

- oversaw Basho's profit and loss statement;

- regularly discussed roadmaps for new projects with management as well as customer needs;

- tracked competitive market trends and guided Basho's senior management with respect to those trends; and

- assisted with business development and customer growth for Basho's sales group.

Corey's motion to dismiss the aiding-and-abetting claim as to the Series H Investment is denied.

37

As with the claim for aiding and abetting against Wray in connection with the December 2014 Investment, the claim potentially has independent significance in connection with the Series H Investment. The allegations of the complaint again support a reasonable inference that Chester and Wray agreed to work together to induce Clark to invest as part of a common scheme. The complaint also supports a reasonable inference that Wray's interactions with Clark evidence his knowing participation in Chester's fraud. Count IV states a claim against Wray.

## III. THE RULE 12(b)(2) MOTION

Corey has moved to dismiss the complaint pursuant to Rule 12(b)(2), claiming that this court cannot exercise jurisdiction over him. To analyze a Rule 12(b)(2) motion, a Delaware trial court applies a two-part test:

> First, the court must determine whether Delaware's long arm statute, 10 *Del. C.* § 3104(c), is applicable. If so, the court must decide whether subjecting the nonresident defendant to jurisdiction would violate due process. Under settled law, a nonresident defendant must have sufficient minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.

*Matthew v. Fläkt Woods Gp. SA*, 56 A.3d 1023, 1027 (Del. 2012) (alteration and internal quotation marks omitted). *See generally* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 3.02 (2d ed. & Supp. 2018).

> The Delaware Long-Arm Statute provides:

> As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an

38

agent: (1) Transacts any business or performs any character of work or service in the State . . . .

10 *Del. C.* § 3104(c)(1). "[A] single transaction is sufficient to confer jurisdiction where the claim is based on that transaction." *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 978 (Del. Ch. 2000); *accord LaNuova D & B S.p.A. v. Bowe Co.*, 513 A.2d 764, 768 (Del. 1986). Under the plain language of the Delaware Long-Arm Statute, forum-directed activity can occur "through an agent." 10 *Del. C.* § 3104(c). The statute is "broadly construed to confer jurisdiction to the maximum extent possible under the Due Process Clause." *Hercules Inc. v. Leu Trust & Banking (Bahamas) Ltd.*, 611 A.2d 476, 480 (Del. 1992).

For purposes of the due process analysis, "[t]he well-established point of departure is that certain minimum contacts must exist between a State and a nonresident defendant before that State can exercise personal jurisdiction over him." *Moore v. Little Giant Indus., Inc.*, 513 F. Supp. 1043, 1048 (D. Del. 1981) (internal quotation marks omitted), *aff'd*, 681 F.2d 807 (3d Cir. 1982) (TABLE). The question is whether the defendant had sufficient minimum contacts with Delaware such that "compelling it to defend itself in the State would be consistent with the traditional notions of fair play and substantial justice." *Waters v. Deutz Corp.*, 479 A.2d 273, 276 (Del. 1984) (internal quotation marks omitted).

The Delaware Supreme Court has adopted what is known as the conspiracy theory of jurisdiction. *Fläkt Woods*, 56 A.3d at 1027. Under this theory,

> a conspirator who is absent from the forum state is subject to the jurisdiction of the court, assuming he is properly served under state law, if the plaintiff can make a factual showing that: (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or

39

substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.

*Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210, 225 (Del. 1982). The theory "is based on the legal principle that one conspirator's acts are attributable to the other conspirators." *Fläkt Woods*, 56 A.3d at 1027. Thus, "if the purposeful act or acts of one conspirator are of a nature and quality that would subject the actor to the jurisdiction of the court, all of the conspirators are subject to the jurisdiction of the court." *Istituto Bancario*, 449 A.2d at 222.

By satisfying the elements for the conspiracy theory of jurisdiction, a plaintiff makes the showing necessary to meet both prongs of the jurisdictional test. The first three *Istituto Bancario* elements encompass the statutory prong by speaking to the requirements of the Delaware Long-Arm Statute. The third *Istituto Bancario* element corresponds to the statutory requirement that the defendant have transacted business or performed work in the State. The first and second *Istituto Bancario* elements provide grounds for imputing the jurisdiction-conferring act to the defendant under agency principles, because "conspirators are considered agents for jurisdictional purposes." *Hercules*, 611 A.2d at 481; *accord Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1995 WL 694397, at *12 (Del. Ch. Nov. 21, 1995). The fourth and fifth *Istituto Bancario* elements speak to due process and whether there are sufficient minimum contacts between the defendant and the forum such that the defendant could reasonably anticipate being sued there. *See Carlton Invs.*, 1995 WL 694397, at *12.

Here, the complaint states a claim against Corey for aiding and abetting fraud in connection with the Series H Investment, satisfying the first and second elements of the conspiracy test. Corey argues that the complaint did not plead the existence of a conspiracy, but "the Court focuses on the substance instead of the form" of the plaintiff's allegations, and "allegations supporting a conspiracy theory of jurisdiction need not be framed as civil conspiracy in the Complaint." *Matthew v. Laudamiel*, 2012 WL 605589, at *7 (Del. Ch. Feb. 21, 2012). A sufficiently pled claim for aiding and abetting satisfies this requirement. *See Benihana of Tokyo, Inc. v. Benihana, Inc.*, 2005 WL 583828, at *7 (Del. Ch. Feb. 4, 2005).

The Series H Investment required both the filing of a restated certificate of incorporation with the Delaware Secretary of State and the creation of a Delaware entity, KECC. Each is sufficient to serve as a Delaware-directed act in satisfaction of the third element. *See Virtus Capital L.P. v. Eastman Chem. Co.*, 2015 WL 580553, at *14–15 (Del. Ch. Feb. 11, 2015).

Based on Corey's deep involvement with Basho, his thorough knowledge of its operations, and his sophistication as the holder of an MBA, it is reasonable to infer that Corey had reason to know that the Series H Investment involved the filing of the restated certificate of incorporation and the formation of a Delaware entity. Given this Delaware nexus, it is therefore reasonable for him to be subject to the jurisdiction of the Delaware courts for purposes of litigation involving the Series H Investment. *See id.*

Corey has argued that Clark did not serve him pursuant to the Delaware Long-Arm Statute, having instead attempted to effect service under 10 *Del. C.* § 3114. Corey argues

41

that Clark should not be able to rely on the Delaware Long-Arm Statute to support personal jurisdiction. But the analysis of personal jurisdiction under Rule 12(b)(2) assesses the court's power to exercise jurisdiction over the defendant. The question of whether the defendant was validly served is a matter raised by a motion to dismiss under Rule 12(b)(5). Corey did not move to dismiss on that ground.

## IV.    CONCLUSION

Corey's motion to dismiss the complaint pursuant to Rule 12(b)(6) is granted in the following respects:

- As to Counts II and III in their entirety.

- As to Count IV with respect to the October 2014 Investment and the December 2014 Investment.

Corey was not named as a defendant in Count I. The Rule 12(b)(6) motion is otherwise denied. The Rule 12(b)(2) motion is denied.

Wray's motion to dismiss the complaint pursuant to Rule 12(b)(6) is granted in the following respects:

- As to Count III in its entirety.

- As to Counts I and II with respect to the October 2014 Investment.

The motion is otherwise denied.